The FALCONWOOD CORPORATION,
Plaintiff,

v.

The UNITED STATES, Defendant.

No. 95–479T, 98–31T.

United States Court of Federal Claims.

April 26, 2004.

William C.G. Swift, Jr., New Haven, CT, with whom were Earl H. Nemser and Donald Schapiro, for plaintiff.

Mary M. Abate, Washington, D.C., with whom were Eileen J. O'Connor, Assistant Attorney General, Tax Division, and Mildred L. Seidman, Chief, Court of Federal Claims Section, for defendant.

## Opinion and Order [1]

SYPOLT, Judge.

Before the court are cross-motions for summary judgment in this consolidated [2] action pursuant to Internal Revenue Code ("I.R.Code") § 7422 [3] for refund of (1) tax and interest in the aggregate amount of $2,102,211 for the taxable years ending on March 31, 1981, 1982, and 1984–1986; and (2) tax and interest of $1,729,895.36 for the short taxable year April 1, 1986 through December 23, 1986. Defendant has counterclaimed for

$624,830.15 in unpaid interest for the short period ending December 23, 1986.[4]

### Facts

The parties do not dispute the following facts [5]:

The Mocatta Group, five corporations treated as an "affiliated group" under I.R.Code § 1504 (the "Group"), began filing consolidated returns, for fiscal years ending on March 31, in 1981. Dr. Henry Jarecki and eight trusts for the benefit of his three sons (the "Jarecki children") (together, the "Jarecki Family Group") owned all of the corporate stock of the companies in the group.

The parent company (or common parent) of the Group was TMC Holdings Corporation ("TMCH"). Plaintiff(formerly known as The Mocatta Corporation ("Mocatta")), the Rimmon Corporation ("RC"), and Falconwood Securities Corporation ("FSC") all were wholly-owned subsidiaries of TMCH. Wallace Commodities Inc. ("WCI") was a wholly-owned subsidiary of Mocatta Futures Corporation ("MFC"), in turn, a wholly-owned subsidiary of Mocatta.

TMCH and its subsidiaries did business as commodity and precious and non-ferrous metals dealers or brokers, trading in physical metals, regulated futures contracts, forward transactions, financial instruments, and options on financial instruments.

On December 23, 1986, to avoid the imposition of a new tax, effective on January 1, 1987, on the built-in gains of corporations converting to small business status under I.R.Code §§ 1361, et seq. ("subchapter S"),[6]

---

1. This opinion originally was issued on April 6, 2004. At defendant's request, it is being reissued for publication, and has been amended to award judgment to defendant on its counterclaim.

2. Plaintiff, formerly known as The Mocatta Corporation, filed the first complaint on July 27, 1995 (Docket No. 95–479T) claiming refunds disallowed by the IRS for tax years 1981–1986. It filed a second complaint on January 16, 1998 (Docket No. 98–31T) for a refund of taxes and interest paid for its 1987 taxable year. The cases were consolidated on June 11, 1998.

3. Unless otherwise indicated, section references are to sections to "I.R.Code" are to the Internal

Revenue Code of 1954, as amended and codified at Title 26, United States Code, and as in effect during the years in question.

4. Plaintiff has agreed that the government is entitled to recover on its counterclaim an overpayment caused by an IRS computer error, together with applicable interest.

5. The parties have stipulated to most of these facts.

6. The Tenth Circuit has summarized the advantages and purposes of subchapter S status:

   Subchapter S ... permits certain corporations to elect to be taxed in a similar, but not

*see* I.R.Code § 1374 (1986); § 633(b) of the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat.2085, the Jarecki Family Group carried out a corporate restructuring to convert the five corporations into three entities owned by individuals, as required by I.R.Code § 1361(b)(1), and thus eligible for treatment as small business corporations under subchapter S.

These were the day's events:

(1) TMCH and RC merged with and into Mocatta[7] and WCI was liquidated into MFC. A certificate of merger was filed in Delaware at 11:00 a.m. showing Mocatta as the surviving corporation.

(2) FSC transferred a $2,125,062 note, payable by Henry Jarecki, to Mocatta. FSC also paid Mocatta a $1,538,677 dividend, which was wire-transferred at 1:20 p.m. MFC transferred exchange seats valued at $1,097,500, and paid a $13 million dividend, wire-transferred at 2:26 p.m., to Mocatta.

(3) Mocatta sold the stock of MFC and FSC to the Jarecki Family Group for $ 8,173,000.

(4) The trusts in the Jarecki Family Group sold all their stock in Mocatta, MFC, and FSC to the Jarecki children for its book value (apparently $18,679,470), and lent them $11,660,000 in cash.

(5) The Jarecki family, in proportion to their stockholdings, made capital contributions $12.5 million in cash to MFC, and made subordinated loans of $14 million to Mocatta.

(6) Each of the shareholders of Mocatta, MFC, and FSC executed an agreement

to make distributions that, in the aggregate, would allow the shareholders to meet the interest obligations on their notes payable to the corporations and to satisfy their income tax obligations attributable to ownership of the subchapter S corporations.

(9) Each of Mocatta, MFC and FSC, and their respective shareholders executed agreements restricting transfer of the corporate stock, in order to retain subchapter S status, among other purposes.

(10) The board of directors of each of Mocatta, MFC, and FSC adopted resolutions authorizing their respective subchapter S elections effective January 1, 1987. (These were not mailed until December 30, 1986.)

Thus, by the end of the day on December 23, 1986, only three entities (Mocatta, MFC and FSC) remained, linked only by their common stockholders. None had a subsidiary, or a common parent.

Mocatta filed a consolidated return under the name of "The Mocatta Corporation & Subsidiaries, Formerly TMC Holdings Corp. & Subsidiaries," for the 12–month period ending March 31, 1987. This enabled Mocatta to offset a $10.3 million loss, apparently sustained after December 23, 1986, for unknown reasons, against the Mocatta Group's income for its taxable year ending 1987, and its 1984 to 1986 taxable years. This resulted in a credit carryback to 1981 and 1982. In 1989, Mocatta filed amended returns seeking refunds for those years.

This case, although arising in the context of subchapter S, revolves around the definition of a consolidated or affiliated group, a concept that applies in other situations subject to the I.R.Code.

identical, fashion as partnerships. * * * A subchapter S corporation generally does not pay taxes as an entity. * * * Instead, [its] profits and losses pass through directly to its shareholders on a pro rata basis and are then reported on the shareholders' individual tax returns. * * * This conduit approach allows shareholders to avoid double taxation on corporate earnings. Tax integrity, meanwhile, is preserved by requiring shareholders to treat all income and deductions as if realized directly from the source from which realized by the corporation, or incurred in the same manner as incurred by the corporation." * * *
*Gitlitz v. Comm'r,* 182 F.3d 1143, 1146 (10th Cir.1999) (citations omitted).

7. The Mocatta Group members were regulated by the Commodities Futures Trading Commission and various commodities exchanges. The downstream merger of TMCH into Mocatta avoided the risk and delay incident to obtaining regulatory approval of a transfer of Mocatta's seats, or options to purchase seats, on some of these exchanges.

Upon audit of the amended returns, the Internal Revenue Service ("IRS") determined that the Mocatta Group's consolidated group status, and its tax year both ended when the common parent, TMCH, went out of existence on December 23, 1986, during the restructuring. The IRS thus required the Mocatta Group to file a final consolidated return, showing TMCH as the common parent, for the short taxable year from April 1, 1986 through December 23, 1986 ("First Short Year"), and required Mocatta, MFC, and FSC to file separate returns for the period of December 24, 1986 through March 31, 1987 ("Second Short Year"). Accordingly, the IRS disallowed any loss carry-back from the Second Short Year to the First Short Year, resulting in an increase of $1,503,099 in taxes for the First Short Year. The IRS also disallowed the loss and credit carrybacks to the Mocatta Group's prior taxable years.[8]

For the reasons discussed below, the court denies plaintiff's motion for summary judgment and grants defendant's cross-motion.

### Standard of Review

Summary judgment is appropriate when the court finds both that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c) of the Rules of the United States Court of Federal Claims; see also Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "The moving party bears the burden of demonstrating the absence of genuine issues of material fact." Dairyland Power Coop. v. United States, 16 F.3d 1197, 1202 (Fed.Cir.1994).

The court agrees with the parties that there are no genuine issues of material fact in dispute and that this case rests solely on legal issues to be decided based on principles of statutory and regulatory interpretation. Thus, the case is eminently suitable for resolution by summary judgment. E.g., EEOC v. Arabian Am. Oil Co., 499 U.S. 244, 247–48, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).

"The fact that both parties have moved for summary judgment does not mean that the court must grant judgment as a matter of law for one side or the other." Prineville Sawmill Co. v. United States, 859 F.2d 905, 911 (Fed.Cir.1988). Rather, "each party's motion must be evaluated on its own merits and all reasonable inferences must be resolved against the party whose motion is under consideration." Promac, Inc. v. West, 203 F.3d 786, 788 (Fed.Cir.2000).

### Discussion

■ The sole issue in this case is whether, as defendant argues, the restructuring of the Mocatta Group should be treated as a single transaction that terminated the Group and its taxable year, or, as plaintiff argues, that the Group survived the downstream merger of TMCH into Mocatta, permitting Mocatta to file a consolidated tax return for the full taxable year ending March 31, 1987.

Filing consolidated federal income tax returns is a privilege granted under I.R.Code § 1501 to affiliated groups of corporations meeting the requirements imposed by § 1504. Section 1501 states:

An affiliated group of corporations shall, subject to the provisions of this chapter, have the privilege of making a consolidated return with respect to the income tax imposed by chapter I for the taxable year in lieu of separate returns. The making of a consolidated return shall be upon the condition that all corporations which at any time during the taxable year have been members of the affiliated group consent to all the consolidated return regulations prescribed under section 1502 prior to the last day prescribed by law for the filing of such return. The making of a consolidated re-

---

8. Defendant initially raised a jurisdictional question regarding the claim for the First Short Year, case No. 98–31T, because plaintiff had not paid its taxes in full with respect to this period, as required by Flora v. U.S., 357 U.S. 63, 75, 78 S.Ct. 1079, 2 L.Ed.2d 1165 (1958) (opinion on rehearing). The objection was withdrawn, on the grounds stated in Shore v. U.S., 9 F.3d 1524, 1527 (Fed.Cir.1993) (holding that the "full payment rule" of Flora is satisfied if the taxpayer pays the full amount of the assessed tax deficiency, exclusive of penalties and interest (unless the penalties are contested)).

turn shall be considered as such consent...

I.R.Code § 1502 provides:

The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return and of each corporation in the group both during and after the period of affiliation, may be returned, determined, computed, assessed, collected, and adjusted in such manner as clearly to reflect the income-tax liability and the various factors necessary for the determination of such liability, and in order to prevent avoidance of such tax liability.

Based on this statutory authority, this court, like others, has long treated the consolidated return regulations, unlike ordinary Treasury Regulations, as legislative in character and as having the force and effect of law. *See Union Electric Company of Missouri v. United States*, 158 Ct.Cl. 479, 486, 305 F.2d 850, 854 (1962); *Rite Aid Corp., v. United States*, 46 Fed.Cl. 500 (2000) *rev'd*, 255 F.3d 1357, 1359 (Fed.Cir.2001).

I.R.Code § 1504(a), in relevant part, defines an "affiliated group" as: "[one] or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation." An "includible corporation" is defined by § 1504(b) generally as a corporation other than a tax exempt or foreign corporation or an insurance company. Treas. Reg. § 1.1502–1(a) defines "group" as an "affiliated group of corporations as defined in section 1504" and cross-references Treas. Reg. § 1.1502–75(d) to determine when a group remains in existence.

Treas. Reg. § 1.1502–75(d)(1)(emphasis added) sets out the general rule that: "[a] group remains in existence for a tax year if the common parent *remains* as the common parent and at least one subsidiary that was affiliated with it at the end of the prior year *remains* affiliated with it at the beginning of the year, whether or not one or more corporations have ceased to be subsidiaries at any time after the group was formed." Although there appears to be no case law or I.R.S. guidance on this point, it appears to be ac-

cepted that a "chain" may exist for purposes of § 1504(a) if as few as two corporations, one a subsidiary, the other a common parent, are linked.

The surviving common parent test was not met here, because the former common parent, TMCH, was merged with and into Mocatta, and went out of existence before the beginning of the new taxable year, and very early in the restructuring transaction.

There are only two exceptions to the foregoing rule. The first, set out in Treas. Reg. § 1.1502–75(d)(2)(i), applies when the common parent merely changes its identity, form, or place of organization. This exception concededly does not apply in these circumstances.

The second exception is the focus of this case. It provides that the affiliated group will be considered to *remain* in existence *notwithstanding that the common parent is no longer in existence* "if the members of the affiliated group succeed to and become the owners of substantially all of the assets of such former parent and there remains one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation and which was a member of the group prior to the date such former parent ceases to exist." Treas. Reg. § 1.1502–75(d)(2)(ii). This exception applies in a downstream merger, such as this, when a common parent merges into a subsidiary that becomes the common parent. Plaintiff states that this exception was created by the decisions in T.D. 6894, 1966–2 C.B. 362 and T.D. 7246, 1973–1 C.B. 381.

Otherwise put, entitlement to the exception depends on two conditions: (1) that the members of the former affiliated group succeed to and become owners of substantially all of the assets of the former common parent and (2) that there remains at least one chain of includible corporations that is connected through stock ownership with a common parent that was a member of the former affiliated group.

The purpose of these exceptions is "to recognize the continuity of an affiliated group after a transaction that, even though formally

restructuring the group, did not effect any substantial change in the composition of the group (judged by reference to the underlying assets of the group)." Rev. Rul. 82–152, 1982–2 C.B. 205, 205, 1982 WL 197139.

Plaintiff argues that it satisfied the exception after the downstream merger of TMCH into Mocatta, but before the sale of the stock of FSC and MFC approximately 3 hours later, when the affiliated group became owners of all of the assets of TMCH, and both FSC and MFC "remained" as subsidiaries of the new common parent, Mocatta.

Defendant contends that compliance with the requirement that one or more chains of includible corporations connected with a common parent "remain" must be evaluated at the conclusion of the restructuring.

Resolution of this issue depends on the meaning of the word "remains" in Treas. Reg. § 1.1502–75(d)(2)(ii).

In *Union Electric, supra,* the Court of Claims discussed the meaning of "remains" in the context of the continuity of an affiliated group under the predecessor regulations,[9] at Treas. Reg. 129 § 24.11(c) and (d)(1951). The court explained:

> It is important to note that both requirements prescribed by § 24.11(c) for continuity of the group are phrased in terms of the word 'remains'—'if the common parent *remains* as a common parent;' and 'if at least one subsidiary *remains* affiliated with it.' It is obvious that in the first requirement, dealing with the common parent the term 'remains' denotes continuity of existence in the status of common parent from one year to the subsequent year. We would interpret the identical word, 're-mains,' in precisely that manner as used in the second requirement-i.e. to indicate *continued existence* of at least one subsidiary

in the status of a subsidiary *from one year to the subsequent year* ... We thus find a definite connotation of continuity in the use of the word 'remains' in § 24.11(c).

*Id.* at 855 (emphasis added).

The expressed purpose of the regulation and exception is consistent with this interpretation. Having been created by the agency charged with interpreting it, *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 843–4, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984); *Schuler Indus., Inc. v. United States,* 109 F.3d 753, 755 (Fed.Cir.1997), the exception has the status of a legislative regulation, *see Union Electric, supra.* Therefore, the court must consider the realities, not the mere formalities, of the transaction, including the actual company ownership and affiliation from one taxable year to the next and before the conclusion of the transaction selected by the taxpayer to achieve its tax-related purpose. *Cf.* Rev. Rul. 82–152, *supra* (discussing need "to recognize the continuity of an affiliated group after a transaction that, even though formally restructuring the group, did not effect any substantial change in the composition of the group").

Plaintiff is asking the court to view the transaction formalistically, applying the exception only to one step of the multi-step restructuring transaction, rather than to the transaction as a whole, disregarding that the completed transaction not only "effect[ed] a[ ] substantial change in the composition of the group," Rev. Rul. 82–152, *supra,* but also was precisely the change intended by the taxpayer.

Applying this interpretation to the second condition of Treas. Reg. § 1.1502–75(d)(2)(ii), it is clear that the existence of subsidiaries for only three hours following

9. Treas. Reg. 129 § 24.11(c) and (d), as promulgated in 1951 under the 1939 Code, provide as follows:

Sec. 24.11. Consolidated Returns for Subsequent Years

(c) When affiliated group remains in existence. For the purpose of these regulations, an affiliated group shall be considered as remaining in existence if the common parent corporation remains as a common parent and at least one subsidiary remains affiliated with it, whether or not such

subsidiary was a member of the group at the time the group was formed and whether or not one or more corporations have become subsidiaries or have ceased to be subsidiaries at any time after the group was formed.

(d) When affiliated group terminates. For the purpose of these regulations, an affiliated group shall be considered as terminated if the common parent corporation ceases to be the common parent or there is no subsidiary affiliated with it.

the downstream merger does not satisfy the requirement of continuity "from one year to the subsequent year," or "continued existence," set forth in *Union Electric.*

*Step Transaction Doctrine*

The same result follows from application of the "step transaction doctrine," which is implicit in the "remaining" and "continuity" concepts underlying the provisions we are interpreting.

Step transaction analysis is " 'a judicial device expressing the familiar principle that in applying the income tax laws, the substance rather than the form of the transaction is controlling.' " *See Brown v. United States,* 782 F.2d 559, 563 (6th Cir.1986) (quoting *Redding v. Commissioner,* 630 F.2d 1169, 1175 (7th Cir.1980)).

▆ The Supreme Court has described it as follows:

Under this doctrine, interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction. By thus "linking together all interdependent steps with legal or business significance, rather than taking them in isolation," federal tax liability may be based "on a realistic view of the entire transaction." 1 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 4.3.5, p. 4–52 (1981).

*Commissioner v. Clark,* 489 U.S. 726, 738, 109 S.Ct. 1455, 103 L.Ed.2d 753 (1989).

▆ The Court of Claims has applied two tests to determine the existence of a step transaction-an "interdependence test" and an "end result" test:

The "interdependence test" requires an inquiry as to "whether on a reasonable interpretation of objective facts the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." ... The "end result" test, on the other hand, establishes a standard whereby: * * * purportedly separate transactions will be amalgamated into a single transaction when it appears that they were

really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result.

*King Enterprises, Inc. v. United States,* 189 Ct.Cl. 466, 418 F.2d 511, 516 (1969) (citations and footnote omitted).

▆ Under either test, plaintiff's restructuring must be considered at the end of the transaction. Clearly, the Jarecki Family Group and its advisors always intended, for tax reasons, to terminate the existence of the Mocatta Group, and never intended to leave in place, even for a single day, a chain of corporations connected through stock ownership with a common parent.

The diagram accompanying the closing memorandum (Stip. Ex. H 89 at x–780)[10], showing the ownership and relationship of the corporations "BEFORE" the closing on the left side of the page, and listing the three remaining corporations and their ownership under the label "AFTER" the closing on the right, amply demonstrates the intended final outcome of the restructuring transactions of December 23, 1986.

The uncontroverted statement by defendant that "during the planning and the execution of the restructuring, [Mocatta], the Jarecki Family Group, and their advisors intended that the existence of the Mocatta Group (as an affiliated group of corporations within the meaning of Code § 1504) would terminate on the date of the Closing; and that on that date there would be only three separate, individually-owned corporations surviving, as small business corporations eligible to elect Subchapter S status" (Defendant's Proposed Findings of Uncontroverted Fact, p. 8, and Plaintiff's Responses and Objections to Defendant's Proposed Findings of Uncontroverted Fact, p. 11), reinforces this point.

That plaintiff planned to eliminate all of the subsidiaries through the restructuring-and to have none survive the restructuring, even briefly-also is clear from plaintiff's letter to the Commodity Futures Trading Com-

10. References to "Stip. Ex." are to the parties' stipulated exhibits filed with the court on March 11, 2003.

mission on December 4, 1986, stating, "[i]n effect, these transfers will occur virtually simultaneously." Stip. Ex. A.

Plaintiff argues that the "[r]esolution of this question turns on whether plaintiff corporation was the common parent corporation *at the time the Mocatta Group went out of existence.*" Plaintiff's Motion for Summary Judgment, p. 1 (emphasis added). That is not the test under the regulation or common sense. This transient status was necessary merely to achieve another overall goal—*eliminating* any corporate "parent" ownership of the three corporations, so that each might qualify as a subchapter S corporation.

Arguing that the IRS must look at each step in a "multi-step corporate restructuring" (Plaintiff's Motion for Summary Judgment, p. 1) as a separate act, however integrated, is not feasible, practical, or realistic; it is next-to-impossible for the government to ascertain; and, given the control the taxpayer enjoys over such interim steps, would invite abuse.

The court is persuaded that the appropriate point in time to assess the nature of the transaction and to apply the tests conditioning the exception upon which plaintiff relies (and has the burden to prove applicable) is at the conclusion of the restructuring transaction, because "the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series" and the steps "were really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." *King, supra* at 516.

*Single Economic Entity Concept*

"Single economic entity" analysis yields the same result as the previous analytical techniques.

This concept was applied in *Salomon Inc. v. United States,* 976 F.2d 837, 843 (2d Cir. 1992) to uphold a revenue ruling that a transfer between members of an affiliated group does not justify an exception to the investment tax credit recapture rules when there is no intention at the time of transfer to keep the property within the consolidated group.

*See* Rev. Rul. 82–20, 1982–1 C.B. 6, 1982 WL 199022. The Second Circuit reasoned:

> [t]he Code treats consolidated return filers as a single entity principally because it assumes that, contrary to the technicalities of corporate form, they actually function as one unit." Thus, [Regulation] § 1.1502–3(f)(2) holds that there is no § 47(a)(1) "disposition" because it supposes that the transferor corporation is so intertwined with the transferee that it might as well have been moving assets from one branch of its own operation to another.

The court decided, however, that a "preexisting intent" inconsistent with the interim step "changes the picture entirely," and supported the IRS' conclusion that "[w]hen there is no intention at the time of transfer" to maintain the interim situation, "the transaction should be viewed as a whole and not as separate individual transactions." *Salomon,* at 843.

*Salomon* also recognizes the equivalence of the single economic entity and step transaction theories in analyzing corporate restructurings:

> The rapidity with which these components follow one another suggest [sic] that they are, in substance, parts of one overall transaction. * * * Revenue Ruling 82–20 further solidifies this inference by [looking to] ... the "intention at the time of the transfer."

*Id.* at 842 (citation omitted).

*Inequitable Consequences*

Plaintiff's argument that § 1.1502–75(d) intends that upstream and downstream mergers not be treated differently begs the question. Had Mocatta been merged upstream into TMCH, TMCH survived the merger, and all the surviving subsidiaries been liquidated or sold, plaintiff would have been permitted to file a final consolidated return for the full 12–month period. That is not what actually happened, however. Moreover, even if it had happened, and the downstream merger had completed the restructuring transaction, the Group nevertheless would have terminated at that point.

Plaintiff also pleads an equitable argument—that, if it "had been put on notice at

the time of the merger in 1986" of the "theory Defendant advances in this case," it "could have elected to be taxed under subchapter S for the period December 23, 1986 to March 31, 1987," and "the loss would not have been wasted," but would have passed through to the shareholders and offset their individual income.

That the results of defendant's position may appear inequitable, either to plaintiff or the court, does not justify the court's disregard of the terms of the regulation. As the Supreme Court has observed repeatedly "'while a taxpayer is free to organize his affairs as he chooses, nevertheless, once having done so, he must accept the tax consequences of his choice, whether contemplated or not, ... and may not enjoy the benefit of some other route he might have chosen to follow but did not.'" *Mellon Bank, N.A. v. United States,* 265 F.3d 1275, 1281–82 (Fed. Cir.2001) (quoting *C.I.R. v. National Alfalfa Dehydrating & Milling Co.,* 417 U.S. 134, 148, 94 S.Ct. 2129, 40 L.Ed.2d 717 (1974)).

Plaintiff chose to restructure the corporations so that they might elect subchapter S status and thereby avoid unfavorable tax treatment, and be permitted to deduct post-restructuring losses from pre-restructuring gains. Plaintiff's choice of a downstream merger relied on other business reasons, e.g., to avoid seeking regulatory approval that might jeopardize its seats on stock exchanges. It now must live with the tax consequences of its business decisions.

### Conclusion

The court concludes that plaintiff is not entitled to rely on the exception set forth in § 1.1502–75(d)(2)(ii) under the facts of this case. The analytical theories or doctrines commonly applied to such transactions all turn on the true nature of the restructuring activities, which must be ascertained based on the purposes and final result of the entire transaction. Because no "chain[ ] of includible corporations connected...with a common parent" remained at the conclusion of the restructuring here, *Id.,* plaintiff may not invoke the exception claimed.

Accordingly, defendant's motion for summary judgment is GRANTED. The clerk of the court is directed to enter judgment for defendant, including judgment on its counterclaim in the amount of $624,830.15 in unpaid assessed interest, plus applicable statutory interest thereon. The complaints shall be dismissed.