## UNION ELECTRIC COMPANY OF MISSOURI

v.

### The UNITED STATES.

### No. 551-58.

United States Court of Claims.
July 18, 1962.

Norris Darrell, New York City, for plaintiff. M. Bernard Aidinoff, Edward G. Beimfohr, and Sullivan & Cromwell, New York City, were on the brief.

Mildred L. Seidman, Washington, D. C., with whom was Asst. Atty. Gen., Louis F. Oberdorfer, Jr., for defendant. Lyle M. Turner and Philip R. Miller, Washington, D. C., were on the briefs.

DURFEE, Judge.

This is an action brought by the Union Electric Company of Missouri (hereinafter "Union Electric") as successor of The North American Company (hereinafter "North American") for refund of $1,181,178.97 plus interest thereon representing alleged overpayments of income tax and interest by the chain of corporations of which North American was the common parent, filing a consolidated tax return for 1952. The case comes before us on defendant's motion for summary judgment, and the facts insofar as they are material to this motion are not in issue.

North American was incorporated in New Jersey in 1890. As of December 31, 1940, it was the parent corporation of a corporate system embracing some eighty corporations engaging in divergent business activities. Beginning in 1942 North American filed consolidated returns with its subsidiaries, which, with North American, constituted for each of the years at least through 1949 an affiliated group of corporations under the applicable provisions of the Internal Revenue Code.[1] Until 1949, Union Electric and

1. Prior to 1942 North American and its subsidiaries could not file consolidated returns because the applicable statutory provisions provided that they were not includible corporations for purposes of the consolidated return sections. See Section 141(d) of the Revenue Act of

1936, c. 690, 49 Stat. 1648; Section 141(d) of the Revenue Act of 1938, c. 289, 52 Stat. 447; and Section 141(d) of the Internal Revenue Code of 1939, as originally enacted. Section 159 of the Revenue Act of 1942, c. 619, 56 Stat. 798 enacted in 1942, changed § 141(d) of the

its subsidiaries were not includible in the North American affiliated group because North American did not own the percentage of the Union Electric shares required by § 141(d) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 141 (d). During December 1948 North American acquired the requisite proportion of Union Electric shares and the Union Electric group became includible and was in fact included in the North American group for consolidated return purposes for the taxable year 1949.

As of January 1, 1950, North American owned at least 95 percent of the voting power of all classes of stock, and at least 95 percent of each class of non-voting stock (excluding stock limited and preferred as to dividends) of four subsidiary corporations, and certain of these subsidiary corporations themselves held at least 95 percent of the voting power of all classes of stock and each class of non-voting stock (exclusive of stock limited and preferred as to dividends) of other corporations, so as to constitute a corporate chain as set forth below:

| Corporation | Business |
| --- | --- |
| North American .......................... | Holding Company |
| (1) Hevi-Duty Electric Company ........ | Manufacturer of electric furnace equipment. |
| (2) 60 Broadway Building Corporation .. | Real Estate |
| (3) Union Electric Company of Missouri .. | Electric, heating, and public utility holding. |
| (a) Union Electric Power Company .. | Electric and gas utility |
| (i) Union Colliery Company .... | Coal mining |
| (b) St. Louis & Belleville Electric Railway Company. | Electric railway transportation. |
| (c) Geyer Realty Company .......... | Real estate |
| (d) Poplar Ridge Coal Company ..... | Coal |
| (4) North American Light & Power Company. | Holding company |
| (a) Missouri Power & Light Company. | Electric and gas utility |

For the taxable year 1949 all of the corporations included in the list above joined in a consolidated tax return pursuant to § 141 of the Internal Revenue Code of 1939. For the subsequent tax years through 1954, however, this was not the case. The Excess Profits Tax Act of 1950, in § 101,[2] 26 U.S.C. (1952 ed.) § 448, provided an optional excess profits tax credit for regulated public utility corporations which was not available to corporations generally. To quali-

fy for this special excess profits tax credit § 448(d) required that the corporation derive a minimum of 80 percent of its gross income (exclusive of dividends and capital gains and losses) from utilities operations described in § 448(c). In the Excess Profits Tax Act of 1950, Congress also, in § 301[3] thereof, amended § 141 of the Internal Revenue Code of 1939, 26 U.S.C. (1952 ed.) § 141, to alter consolidated returns provisions applicable to regulated utilities electing to take ad-

1939 Code to broaden the definition of "includable" corporations and enabled the North American group to qualify for consolidated return privileges.

2. 64 Stat. 1137, 1174.

3. 64 Stat. 1137, 1217.

vantage of the special excess profits tax credit afforded by § 448. Thus, § 141(e)(8) provided that a regulated public utility corporation electing to compute its excess profits tax credit under § 448 was not an "includible" corporation in an affiliated group which included any corporations not computing excess profits credits under § 448, and thus could not join in filing a consolidated return with such corporations. Section 141(j) provided, however, that two or more regulated public utilities electing to compute their excess profits tax pursuant to § 448 could be includible corporations in an affiliated group composed exclusively of regulated public utility corporations electing to compute excess profits tax credits pursuant to § 448, and that a group so constituted could join in filing a consolidated return.

During each of the years 1950, 1951, 1952 and 1953 four companies of the North American chain—Union Electric, Union Electric Power Company, Missouri Power and Light Company, and St. Louis & Belleville Electric Railway Companies—were regulated public utility corporations as defined in § 448(d), and thus eligible to elect the special excess profits tax credit provided by § 448. In addition, North American itself, pursuant to § 448(e) was eligible to join in consolidated returns with these companies as the common parent for the years 1950, 1951 and 1952, inasmuch as more than 80 percent of its gross income (computed without regard to capital gains and losses) during each of those years was deemed derived from regulated public utility sources as described in § 448(c). Consequently, during each of the years 1950, 1951 and 1952 North American and its four regulated public utility subsidiaries, electing to compute their respective excess profits tax credits pursuant to § 448, joined in filing consolidated returns. During these same years the non-utility corporations in the North American chain filed separate re-

turns, for they were not includible in the utilities group computing excess profits tax credits under § 448.

For the year 1952, with which we are directly concerned, the consolidated income of North American and its utility corporations joining in the consolidated return was $17,504,972.96. North American itself, however, after elimination in the consolidated return of over $11,000,000 of intercompany dividends received from Union Electric, had a loss of $820,413.77, which was absorbed by income from the subsidiary corporations included in the consolidated return.

During 1953 and 1954, inasmuch as North American had no income from regulated public utility sources, it was precluded under § 448(e) from participating in consolidated returns with its utility corporations electing the special credit afforded by § 448. Thus, during 1953 and 1954, the utility companies that had joined in consolidated returns with North American from 1950–1952, each filed separate returns in which each elected to use the § 448 excess profits tax credit.

During 1953 North American joined in a consolidated return with entirely different subsidiaries—North American Light and Power Company, 60 Broadway Building Corporation, and Hevi-Duty Electric Company.[4] Each of these corporations had filed separate returns during the years 1950–1952, and none of them were regulated public utility corporations eligible to elect the § 448 excess profits tax credit. For 1953 this group had a consolidated net loss of $373,721.83. To this figure North American itself had contributed a loss of $890,939.07.

During 1954 North American and the same subsidiaries filed a consolidated return. For the tax year 1954 the consolidated net loss was $681,967.58, to which figure North American had contributed a loss of $1,080,176.54.

4. There were some other changes, but for disposition of this case the facts as stated are sufficient.

Plaintiff contends that it is entitled to carry back the consolidated net operating losses, to the extent attributable to North American, of the group of miscellaneous corporations for 1953 and 1954 to be deducted from the consolidated net income of the North American utilities group in 1952. It is defendant's position that because the only link between the 1952 group and the group joining in consolidated returns in 1953 and 1954 is the presence of North American, the common parent—i. e. none of the subsidiaries joining with North American in the 1952 consolidated return were included or includible in the consolidated returns in which North American joined for the loss years 1953 and 1954—North American's losses can be carried back to offset 1952 income only to the extent that North American contributed income to the 1952 group. Inasmuch as North American suffered losses in 1952, defendant contends that none of North American's 1953 and 1954 losses may be carried back to 1952.

Basically the issue in the case is whether North American had one affiliated group which remained continuously in operation during the years 1952, 1953 and 1954, within the meaning of the applicable provisions of the Code and regulations which confer and define the privilege of filing consolidated returns, or whether the 1952 group of utility corporations electing to compute their excess profits credits pursuant to § 448 is separate and distinct from the group of miscellaneous corporations with which North American joined in consolidated returns during 1953 and 1954. If the North American group of 1952 is deemed to have continued in existence as the same group in 1953 and 1954 solely by virtue of the fact that North American was the common parent in both years, the consolidated losses for the group in 1953 and 1954, to the extent attributable to North American, could properly be carried back to offset consolidated income of the group in 1952.[5] On the other hand, should we conclude that the 1952 utilities group terminated in 1953 when North American ceased to be includible therein and that a new affiliated group was then formed by North American and its non-utility corporations, then North American would be deemed to have joined in the consolidated returns of another affiliated group during 1953 and 1954, and consequently consolidated losses of the 1953–1954 group to the extent attributable to North American could be carried back to offset 1952 consolidated income of the 1952 group only to the extent attributable to North American.[6] Inasmuch as North American contributed no income to the consolidated income of the group in 1952, none of the losses in subsequent years could then be carried back to offset 1952 consolidated income.

Section 141 of the 1939 Code, 26 U.S.C. (1952 Ed.) extends the privilege of filing consolidated income tax returns to all corporations constituting an affiliated group. Section 141(d) defines affiliated group as one or more chains of *includible* corporations connected through stock ownership with a common parent which is an includible corporation, if at least 95 percent of the voting power of all classes of stock and at least 95 percent of each class of non-voting stock of each includible corporation, except the common parent, is owned by one or more of the other includible corporations and the common parent owns stock possessing at least 95 percent of the voting power of all classes of stock and at least 95 percent of each class of non-voting stock of at least one of the includible corporations. Section 141(e) defines "includible corporation" as any corporation except those falling into certain enumerated categories. Section 141 (b) directs the Secretary of the Treasury to prescribe regulations as he deems necessary to determine, compute, and collect the tax liability of any affiliated

---

5. Treasury Regulations 129, § 24.31(a) (4) (1951).

6. Treasury Regulations 129, § 24.31(b) (3).

group of corporations to clearly reflect the income and excess profits tax liability of such corporations. Regulations so promulgated, unlike ordinary Treasury Regulations, are legislative in character and have the force and effect of law. Charles Ilfeld Co. v. Hernandez, 292 U.S. 62, 54 S.Ct. 596, 78 L.Ed. 1127 (1934); S. Slater & Sons v. White, 119 F.2d 839 (1st Cir. 1941).

■ Plaintiff relies primarily for support of its position on Treasury Regulations 129 § 24.11(c) and (d), as promulgated in 1951 under the 1939 Code, which provide as follows:

"Sec. 24.11. *Consolidated Returns for Subsequent Years*
\*　　\*　　\*　　\*　　\*

"(c) *When affiliated group remains in existence.*

"For the purpose of these regulations, an affiliated group shall be considered as remaining in existence if the common parent corporation remains as a common parent and at least one subsidiary remains affiliated with it, whether or not such subsidiary was a member of the group at the time the group was formed and whether or not one or more corporations have become subsidiaries or have ceased to be subsidiaries at any time after the group was formed.

"(d) *When affiliated group terminates.*

"For the purpose of these regulations, an affiliated group shall be considered as terminated if the common parent corporation ceases to be the common parent or there is no subsidiary affiliated with it."

Inasmuch as during each of the years in question North American had at least one corporation affiliated with it, plaintiff avers that there was one affiliated group in continuous existence during all of the years under consideration.

Countering this argument, defendant fastens on the word "remains" in § 24.11 (c), and argues that for an affiliated group to continue in existence from year to year, at least one subsidiary from a previous year must *remain* affiliated with the parent corporation in the succeeding year. The situation may be illustrated graphically as follows:

```
   1951         1952         1953         1954
  Parent       Parent       Parent       Parent
    |           /\           /\           /\
S1, S2, S3, S4  S4  S5      S6  S7      S6  S7
```

Both parties would agree that the group continued in existence from 1951 through 1952. Plaintiff would argue that inasmuch as at least one subsidiary was affiliated with the parent in 1953, the affiliated group would also continue in existence during 1953. Defendant, because no subsidiary from the 1952 group *remained* affiliated with the parent in 1953, would argue that the 1951–1952 group terminated at the end of 1952, and that the 1953 group constituted an entirely new affiliated group, in which case consolidated operating losses of the 1953–1954 group, to the extent attributable to the common parent, could be carried back to offset 1952 consolidated income only to the extent that income was attributable to the common parent in 1952.

At the outset, we note that section 24.11(c) and (d) of the regulations, upon which plaintiff relies, appears under the general heading *"Consolidated returns for subsequent years."* Section 24.11(a) provides that once a group has filed a consolidated return for one year, a consolidated return is required for each subsequent year during which the affiliated group remains in existence absent one of the three enumerated exceptions. The prescriptions of § 24.11(c) and (d) are provided to determine when the group continues in existence for this purpose. They do not purport to define the composition of the group or the existence of the group generally. Even accepting the applicability of § 24.11(c) and (d), we would not conclude that these subparagraphs establish plaintiff's position.

Section 24.11(c) sets forth two criteria, both of which must be present to insure the continued existence of the group: (a) "The common parent corporation remains as a common parent," and (b) "at least one subsidiary remains affiliated with it." We do not believe that at least one subsidiary remained affiliated with the group, within the context of the regulations. Section 24.2(d) defines the term "subsidiary" for use in the regulations as meaning "a corporation * * * which is a member of the affiliated group during any part of the consolidated return period." Section 24.2(c) defines "consolidated return period" as any year for which a consolidated return is made or is required. Thus under this definition of "subsidiary" North American's non-utility corporations were not "subsidiaries" during 1952, when they were not members of the North American affiliated group. Indeed during 1952 they could not have been members of the North American affiliated group for they were not includible corporations, pursuant to § 141(j) of the Code, in an affiliated group of regulated utility corporations electing to compute excess profits tax credits under § 448. Inasmuch as none of the corporations with which North American filed consolidated returns during 1953 and 1954 were "subsidiaries" of North American during 1952, it would seem that North American had no subsidiary remaining affiliated with it in 1953. It is important to note that both requirements prescribed by § 24.11(c) for continuity of the group are phrased in terms of the word "remains" —"if the common parent *remains* as a common parent;" and "if at least one subsidiary *remains* affiliated with it." It is obvious that in the first requirement, dealing with the common parent the term "remains" denotes continuity of existence in the status of common parent from one year to the subsequent year. We would interpret the identical word, "remains," in precisely that manner as used in the second requirement—i. e. to indicate continued existence of at least one subsidiary in the status of a sub-

sidiary from one year to the subsequent year. As we have seen, the term "subsidiary" is defined in the regulations § 24.2(d) to mean an affiliated corporation. Consequently, if we are to interpret the word "remains" consistently, the words "if at least one *subsidiary* [i. e. affiliated corporation] remains affiliated with it" must perforce be used to require that at least one of the affiliated corporations constituting subsidiaries in the one year *remain* affiliated with it in the subsequent year. Otherwise there would seem no point in using the words "remains affiliated." We thus find a definite connotation of continuity in the use of the word "remains" in § 24.11(c). Inasmuch as no "subsidiary" from the 1952 affiliated group remained affiliated with North American during 1953 and 1954, we conclude that the 1952 group did not continue in existence thereafter, and thus that the claimed carrybacks are not allowable. We do not believe that the language of § 24.11(d) was intended to eliminate the requirement of continuity prescribed in § 24.11(c). Section 24.11 (d) merely states in effect that the affiliated group terminates when any one of the two requirements set forth in § 24.11(c) for continued existence is no longer present. While somewhat ambiguous, we do not believe anything in § 24.11(d) was intended to negate the requirements enumerated in § 24.11(c).

Moreover, were we to accept plaintiff's contention, whereby the group may be deemed to continue exclusively by virtue of the common parent retaining the status of a common parent in the subsequent year provided it has any one subsidiary affiliated with it, it would require that such a common parent could never be deemed to have joined in a consolidated return with a different affiliated group in the subsequent year. We do not believe such a result to be consonant with the spirit and structure of the applicable provisions of the Code and the regulations.

For the reasons stated the defendant's motion for summary judgment will be

granted, and the petition will be dismissed

It is so ordered.

JONES, Chief Judge, and LARAMORE and WHITAKER, Judges, concur.

DAVIS, Judge, took no part in the consideration and decision of this case.