**William J. DIETZSCH and Anita Dietzsch**

v.

**The UNITED STATES.**

No. 745–71.

United States Court of Claims.

June 19, 1974.

As Amended on Denial of Rehearing
Oct. 4, 1974.

Martin D. Cohen, attorney of record for plaintiff. Samuel B. Nimberger, New York City, N. Y., of counsel.

Theodore D. Peyser, Jr., Washington, D. C., with whom was Asst. Atty. Gen., Scott P. Crampton, for defendant. Gilbert E. Andrews, and Samuel H. Bayless, Washington, D. C., of counsel.

Before SKELTON, NICHOLS, and BENNETT, Judges.

OPINION

NICHOLS, Judge:

This case involves a claim for refund of Federal income taxes for the plaintiffs' taxable years 1965 and 1966 in the respective amounts of $3,540.57 and $4,804.45. The parties have stipulated the material facts. This court has jurisdiction pursuant to 28 U.S.C. §§ 1346(a) and 1491. The facts found pursuant to the stipulation are stated in the opinion to the extent they are relevant. We hold that the plaintiffs cannot prevail.

William J. Dietzsch and Anita Dietzsch, the plaintiffs, are husband and wife who have resided at all material times in Endwell, New York. Anita Dietzsch is a party plaintiff solely because she filed joint returns with her husband William for the years at issue. The term taxpayer or plaintiff as used hereinafter refers only to William J. Dietzsch.

In 1964 William J. Dietzsch, entered into an agreement with General Motors (hereinafter GM) to establish an automobile dealership, to be known as Dietzsch Pontiac-Cadillac, Inc. Although plaintiff could have obtained loans elsewhere GM required him to finance his operations through the "Dealer Investment Plan", of GM's Motors Holding Division (hereinafter Holding).

The plan is apparently a standard one used with new dealerships. Plaintiff says the terms are not open to negotiation. The respective investments to be made by an "Operator", such as Dietzsch,

and by Holding are described in a GM brochure as follows:

&ast; &ast; &ast; &ast; &ast; &ast;

The Operator's initial investment is a minimum of 25% of the total required capital of the dealership, it may be more—in fact, the Operator is expected to use all his available commercial investment funds in the enterprise. Motors Holding provides the balance of the capital established for the company.

&ast; &ast; &ast; &ast; &ast; &ast;

The Operator makes his investment in the dealership by the purchase of $100 par Class B (non-voting) Stock. Motors Holding Division makes one-half of its investment in 6% long term notes and one-half through the purchase of $100 par Class A (voting) Stock. Shares of each class participate equally in profits on a per-share basis.

In accordance with such plan, Holding organized Dietzsch Pontiac-Cadillac, Inc. Dietzsch made an initial investment of $50,000 by purchasing $100 par Class "B" (non-voting) Stock. Holding provided the remaining $150,000 of capitalization—$75,000 in 6 percent long term notes and $75,000 through the purchase of Class "A" (voting) Stock. There were no other stockholders. Voting and non-voting stock was to share equally in all dividends.

Other features of the "Dealer Investment Plan" are a "Bonus Agreement" and an "Option Agreement". Under the "Bonus Agreement" the "Operator" receives a yearly bonus, in addition to his salary, in the amount of 33 percent of the dealership's net income in excess of an annual rate of return of 15 percent on all funds invested in the dealership.

Article I of the "Option Agreement" gives the "Operator" the right to purchase all of the shares held by Holding, but "only from funds received &ast; &ast; &ast; as dividends or bonus from Dealer Company." However, the Article I option is temporarily suspended, when the number of shares held by Holding is reduced to 20 percent of the number it initially purchased. At that juncture, the 6 percent long term note payable to Holding must be retired by the dealer company and/or purchased by the Operator before the balance of Holding's Class "A" Stock may be retired.

Article II of the "Option Agreement", the tax effect of which is the crux of the present controversy provides:

Operator agrees that during the period of the option granted him in Article I:

A. He will use all dividends received on his Stock and at least one-half of any bonus received by him from Dealer Company to purchase Investor's Stock;

B. He will immediately convert any Class "A" Stock which he purchases from Investor into Class "B" Stock.

&ast; &ast; &ast; &ast; &ast; &ast;

The dealer corporation was not a party to this agreement.

The taxpayer argues that the respective amounts of $10,914.97 and $10,199.65, paid to him as "cash dividends" in 1965 and 1966, and used by him to buy Class "A" Stock from Holding, were non-taxable stock dividends under Internal Revenue Code of 1954, § 305(a)&ast; and therefore not includable in his gross income. He also received bonuses but concedes they were taxable. If the dividend distributions received by the taxpayer in 1965 and 1966 were stock dividends, their taxability is governed by § 305, as it read prior to its amendment by the Tax Reform Act of 1969, Pub.L. No. 91–172, § 421(a). That section read as follows:

305. Distributions of Stock and Stock Rights.

(a) General rule.—Except as provided in subsection (b), gross income does not include the amount of any distribution made by a corporation to its shareholders, with respect to the

---

&ast; Hereinafter all section references are to the Internal Revenue Code of 1954.

stock of such corporation, in its stock or in rights to acquire its stock.

(b) Distributions in lieu of money. —Subsection (a) shall not apply to a distribution by a corporation of its stock (or rights to acquire its stock), and the distribution shall be treated as a distribution of property to which section 301 applies—

(1) to the extent that the distribution is made in discharge of preference dividends for the taxable year of the corporation in which the distribution is made or for the preceding taxable year; or

(2) if the distribution is, at the election of any of the shareholders (whether exercised before or after the declaration thereof), payable either—

(A) in its stock (or in rights to acquire its stock), or

(B) in property.

\*    \*    \*    \*    \*    \*

We therefore must first decide: 1) whether the distributions made by the dealer company to Dietzsch were stock dividends, and if so 2) whether they were non-taxable stock dividends under § 305(a) or taxable stock dividends under § 305(b). Our analysis does not reach the latter question since, in our judgment, the distributions in question were not stock dividends.

■ The taxpayer's contention that the cash distributions made to him constituted stock dividends is premised on the step transaction doctrine. The objective of that doctrine is to give tax effect to the substance, as opposed to the form of a transaction, by ignoring for tax purposes, steps of an integrated transaction that separately are without substance. See, King Enterprises, Inc. v. United States, 418 F.2d 511, 189 Ct. Cl. 466 (1969).

In the case at bar, the taxpayer was required by the "Option Agreement" to use all of his dividends to purchase Class "A" Stock from Holding, and then immediately to convert the purchased Class "A" Stock into Class "B" Stock, which of course left Holding in entire control. Dietzsch complied with the contractual obligation, so that each time he received a dividend check the following series of events was triggered:

(1) Upon receipt of his dividend check, Dietzsch endorsed it to the order of Holding and immediately mailed it to Holding.

(2) Upon receipt of the check from Dietzsch, Holding mailed a Class "A" Stock certificate to Dietzsch endorsed in such a way as to show a sale of certain Class "A" shares to Dietzsch and retention of the balance by Holding.

(3) Dietzsch immediately turned the Class "A" certificate (as endorsed by Holding) in to Dietzsch Pontiac-Cadillac, Inc., with a request that the Class "A" shares he purchased be converted to shares of Class "B" Stock.

(4) Dietzsch Pontiac-Cadillac, Inc. then issued new certificates, one representing the reduced number of Class "A" shares retained by Holding, and the other representing Class "B" shares issued to Dietzsch reflecting his purchase of Class "A" shares and their conversion into Class "B" shares.

■ The taxpayer argues that if we apply the step transaction doctrine, so as to ignore the first event in the above listed sequence, i. e., his receipt of the dividend check, he has received a stock dividend. It is, however, difficult to characterize the taxpayer's reinvestment of the cash distribution he received as a stock dividend, where the ultimate destination of the cash is another shareholder as opposed to the distributing corporation. One usually thinks of a stock dividend as reflecting the retention of assets by the declaring corporation rather than their distribution to shareholders. Furthermore, it is absurd that a single cash

dividend declared and paid by the dealer company at one time, should be treated for tax purposes by one shareholder (Holding) as a cash dividend and as a stock dividend by another (Dietzsch).

Should one apply the step transaction doctrine, in substance what we have more nearly resembles a redemption of Holding's shares by Dietzsch Pontiac-Cadillac, Inc., as opposed to a stock dividend to Dietzsch. A redemption is defined by § 317(b) as follows:

\* \* \* \* \* \*

(b) Redemption of stock.—For purposes of this part [§§ 301–318 of this title], stock shall be treated as redeemed by a corporation if the corporation acquires its stock from a shareholder in exchange for property whether or not the stock so acquired is cancelled, retired, or held as treasury stock. \* \* \*

It might plausibly be argued that Dietzsch was merely a conduit for Holding to exchange its Class "A" Shares for the dealer company's cash. Such a view of the facts would bring the transaction within the § 317(b) definition.

The circuitous route utilized by the parties here for the dividends on "B" Stock to take is by no means fortuitous. The terms of the form contracts provided by GM, were undoubtedly carefully drafted for GM's advantage. If the dealer company redeemed Holding's stock without Dietzsch as an intermediary, the amounts received by Holding would presumably have been taxable as ordinary dividend income under § 302(a). We say "presumably", as Holding's taxes are not before us for adjudication, and of course are not adjudicated by us. The thing seems clear enough for purposes of the Dietzsch's tax problem.

In Richard B. Bennett, 58 T.C. 381 (1972), acq. 1972–2 Cum.Bull. 1, the Tax Court held that the purchase of the majority shareholder's stock by the taxpayer, a minority shareholder, constituted a redemption of the majority shareholder's stock, when the purchase was made with funds distributed to the taxpayer by the corporation. Such funds were borrowed, not earned surplus. The taxpayer was held not taxable on the amounts received by him since he was merely a *conduit* or an *agent* of the corporation. To the same effect Fox v. Harrison, 145 F.2d 521 (7th Cir. 1944); Frank Ciaio, 47 T.C. 447 (1967).

The present case is distinguishable since Mr. Dietzsch was more than just a conduit or an agent of Dietzsch Pontiac-Cadillac, Inc. In *Bennett*, the role played by the purchasing shareholder totally lacked economic substance. The form of the transaction in that case was designed to protect the selling shareholder from liability to creditors, in his capacity as a director, for the impairment of capital caused by the corporation's borrowing the consideration to be paid him for his shares. Corporate records reflected in that case that a meeting was held for the purpose of shareholder consideration of the purchase and retirement of the selling shareholders stock and the borrowing of funds to finance such purchase. Furthermore the taxpayer never owned or became personally obligated to pay for the stock, lacked the funds and borrowing capacity to pay for the stock and did not increase his own net worth via the transaction. The corporation merely switched from equity to debt capitalization.

In contrast, in the case at bar, the corporate records reflect the declaration of a cash dividend. The purpose of such dividend was a distribution of earnings as opposed to financing the purchase of a shareholder's stock. Dietzsch was personally obligated to purchase Holding's shares, while the corporation had no such obligation. If the dealer company had made payment directly to Holding in discharge of Dietzsch's obligation to Holding, this still would have resulted in a constructive dividend to him. *See,*

Wall v. United States, 164 F.2d 462 (4th Cir. 1947); Thomas C. Stephens, 60 T. C. 1004 (1973), and cases cited therein. Perhaps most important, the end result of the transaction was that Dietzsch realized an economic gain that Congress surely did not mean to exempt from taxation.

In sum, the transaction in question is not regarded for tax purposes as a stock dividend to Dietzsch or as a redemption of Holding's stock since it lacks the substance of either transaction.

Plaintiff lays great stress on the fact that the form of the transaction was in no way his choice. This is, apparently, to refute any possible argument that the step transaction doctrine is unavailable because of plaintiff's tax avoidance motivation. The approach we take makes it irrelevant that plaintiff obviously had no such motive. However, the draftsmen could have had in mind that other terms were more favorable to plaintiff because of the tax burden plaintiff absorbed. The record reflects that the continued operation of the plan led to plaintiff's being sole owner and in full control soon after the tax years involved, the equity and debt in Holding being all liquidated, and this all accomplished out of the earnings of the business. Though the contract was in a sense one of adhesion, clearly it was written to attract a businessman who would scrutinize the deal he was making with care and was intellectually capable of bargaining at arm's length. It would be unfair to shift the tax burden off to Dietzsch, while plaintiff retains the other benefits he bargained for. In other situations, courts have considered such reasons as adequate by themselves to preclude any judicial reshuffling of the bargained distribution of tax burdens. Davee v. United States, 444 F.2d 557, 195 Ct.Cl. 184 (1971). Commissioner v. Danielson, 378 F.2d 771 (3d Cir. 1967), cert. denied, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123.

CONCLUSION OF LAW

Upon the stipulated facts, which are made a part of the judgment, the court concludes as a matter of law that the plaintiff is not entitled to recover, and the petition is therefore dismissed.