# United States Court of Appeals for the Federal Circuit

04-5111

THE FALCONWOOD CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

Sanford J. Davis, Withers Bergman LLP, of New York, New York, argued for plaintiff-appellant.  On the brief was Donald Schapiro, Chadbourne & Parke LLP, of New York, New York.  Of counsel on the brief was Alan I. Raylesberg.  Of counsel was William C. G. Swift, Jr., Withers Bergman LLP, of New York, New York.

Michael J. Haungs, Attorney, Tax Division, Appellate Section, United States Department of Justice, of Washington, DC, argued for defendant-appellee.  With him on the brief were Eileen J. O'Connor, Assistant Attorney General, and Jonathan S. Cohen, Attorney.

Appealed from:  United States Court of Federal Claims

Judge Diane Gilbert Sypolt

# United States Court of Appeals for the Federal Circuit

04-5111

THE FALCONWOOD CORPORATION,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED: September 2, 2005

_____

Before CLEVENGER, BRYSON, and PROST, <u>Circuit Judges</u>.

CLEVENGER, <u>Circuit Judge</u>.

Plaintiff-appellant The Falconwood Corporation ("Falconwood") appeals the ruling of the United States Court of Federal Claims on cross-motions for summary judgment that an affiliated group of corporations to which Falconwood belonged did not survive the "downstream merger" of a common parent corporation into its subsidiary corporation, Falconwood's predecessor, because there did not remain after the merger one or more chains of includible corporations connected through stock ownership with a common parent that was a member of the group prior to the date the former parent ceased to exist. <u>See</u> <u>Falconwood Corp. v. United States</u>, 60 Fed. Cl. 485 (2004). The Court of Federal Claims determined that because the group did not survive the

downstream merger under then existing law,[1] the group could not include in a final consolidated tax return losses incurred by Falconwood's predecessor subsequent to the merger. Id. at 488. Because we find to the contrary that the affiliated group survived the downstream merger of the former common parent corporation into Falconwood's predecessor, we reverse the Court of Federal Claims's ruling and remand for a determination of the tax refund due Falconwood.

I

Prior to the events of December 23, 1986, as described hereinafter, the "Mocatta Group" of affiliated corporations consisted of TMC Holdings Corporation, owned by Dr. Henry Jarecki and various trusts established for the Jarecki children, and five wholly-owned subsidiaries. The group was organized as follows:



---

[1]      Throughout this opinion, we refer to various regulations promulgated by the United States Department of the Treasury and various sections of the U.S. Code. Except where noted differently, we refer to the versions of the regulations and U.S. Code in existence at the time of the downstream merger.

[2]      The Mocatta Corporation is now known as The Falconwood Corporation and is the plaintiff-appellant in the present dispute. We refer to it as "Falconwood" throughout this opinion.

Because the group was an "affiliated group" of corporations under 26 U.S.C. § 1504(a)(1), it had filed consolidated tax returns since 1981, based on an April 1-March 31 fiscal year. In 1986, the Jarecki family decided to restructure the group's ownership so that the surviving corporations could elect to be taxable under subchapter S of the Internal Revenue Code ("Code") and thus have untaxed profits "pass through" to individual shareholders. See Cameron v. Comm'r, 105 T.C. 380, 384 (1995) ("When a corporation elects pass-through treatment under subchapter S, its net income earned as an S corporation is taxed currently to the shareholders and thereafter is generally distributed tax-free.").

During the same year, however, Congress passed the Tax Reform Act of 1986 ("TRA" or "Act"), Pub. L. No. 99-514, 100 Stat. 2085, which among other things imposed a tax at the corporate level on pre-election gains when a corporation taxable under subchapter C of the Code elects to be taxed under subchapter S and recognizes those gains within ten years of the election. See Colo. Gas Compression, Inc. v. Comm'r, 366 F.3d 863, 865-66 (10th Cir. 2004) (discussing the relevant section of the Act and the purpose behind its passage). The TRA applied to all subchapter S elections made after December 31, 1986. As a practical matter, the Act placed the Jarecki family on the clock, so to speak, by forcing them to elect to be taxed under subchapter S prior to December 31, 1986, if they were to avoid the tax consequences of the newly enacted TRA.

On December 23, 1986, the Jarecki family restructured the Mocatta Group. The diagram below depicts the three primary configurations of the reorganization— Configurations A, B and C, respectively.



From the initial organization labeled Configuration A, TMCH merged "downstream" into Falconwood. See Harry G. Henn & John R. Alexander, Laws of Corporations 981 (3d ed. 1983) (noting that a "downstream merger" describes the merger of a parent corporation into a subsidiary). At the time, Falconwood held seats on various commodities exchanges, and the downstream merger of TMCH into Falconwood avoided the risk and delay incident to obtaining approval of a transfer of those seats from Falconwood to TMCH. RC also merged into Falconwood, and WCI was liquidated into MFC. A certificate of merger was filed in Delaware at 11:00 a.m. showing Falconwood as the surviving parent corporation. The combination of these initial mergers and the liquidation gave rise to the structure of Configuration B.

FSC next paid a cash dividend of $1,538,677 to Falconwood at 1:20 p.m. and also transferred to Falconwood a note issued by Dr. Jarecki in the amount of $2,125,062. MFC wire-transferred a dividend of $13 million to Falconwood at 2:26 p.m. Falconwood then sold the stock of MFC and FSC to the Jarecki family. All that remained at the end of the day from the original Mocatta Group was Falconwood, MFC and FSC, as shown in Configuration C, each independently owned by the Jarecki

children and set up in such a way as to allow subchapter S elections effective January 1, 1987.

Under the name "The Mocatta Corporation & Subsidiaries (Formerly TMC Holdings Corp. & Subsidiaries)," Falconwood ultimately filed a consolidated tax return as the common parent of the Mocatta Group for the twelve-month period ending on March 31, 1987. The return covered Falconwood's operations for the entire twelve-month period from April 1, 1986, to March 31, 1987, and those operations of MFC and FSC only from April 1, 1986, to December 23, 1986, the latter date being the date the Mocatta Group terminated. MFC and FSC covered the remainder of their operations—those from December 24, 1986, to March 31, 1987—in separate individual tax returns.

Some time after December 23, 1986, Falconwood sustained a $10.3 million loss. Because Falconwood's operations through March 31, 1987, were covered on the Mocatta Group's final consolidated return, Falconwood offset the group's income for the 1984, 1986 and 1987 taxable years against its own post-December 23 loss, which led to a credit retroactive to 1981 and 1982. In 1989, Falconwood filed amended returns, seeking refunds for those years. The Internal Revenue Service subsequently determined that the Mocatta Group terminated on December 23, 1986, with the downstream merger of TMCH into Falconwood. It further determined that the group must file a final consolidated return for the short taxable year from April 1, 1986, to December 23, 1986, and that the three remaining members—Falconwood, MFC and FSC—would need to file individual returns for the period from December 24, 1986, to March 31, 1987. The decision thus precluded Falconwood from offsetting Mocatta

04-5111                                          5

Group income with Falconwood's post-December 23 loss, resulting in increased tax liability for the group.

On July 27, 1995, Falconwood brought suit in the Court of Federal Claims for the "refund of income taxes and interest erroneously and illegally assessed against and collected from [it]" for the tax years 1981 to 1986. (Joint App. at 67.) On January 16, 1998, Falconwood filed a second complaint covering the tax year 1987. It argued in a motion for summary judgment of April 4, 2003, that the Mocatta Group survived the termination of TMCH, the group's former common parent, because the Mocatta Group succeeded to the assets of TMCH, and both FSC and MFC remained connected as subsidiaries to the new common parent, Falconwood, until the sale of FSC and MFC stock approximately three hours later. The government argued in its own motion for summary judgment of May 9, 2003, that the Mocatta Group's compliance with the regulatory requirement that one or more chains of includible corporations connected with a common parent "remain" after the downstream merger must be judged at the conclusion of the reorganization, i.e., after the remaining corporations reached Configuration C.

Ruling on the cross-motions for summary judgment, the Court of Federal Claims determined that the Mocatta Group did not survive the downstream merger because 26 C.F.R. § 1.1502-75(d), the regulation governing whether a group remains in existence for purposes of filing a consolidated tax return despite termination of the common parent, implied a temporal requirement not satisfied by the group's short stay at Configuration B. Falconwood, 60 Fed. Cl. at 490-91. In the alternative, the court applied the "step transaction doctrine" to the Mocatta Group's reorganization and

determined that the "appropriate point in time to assess the nature of the transaction and to apply the tests conditioning the exception upon which plaintiff relies . . . is at the conclusion of the restructuring transaction," id. at 492, thus effectively erasing Configuration B from the reorganization. As explained below, without the court's recognition of Configuration B, Falconwood did not satisfy the provisions of section 1.1502-75 and could not prevail. The court thus granted summary judgment in favor of the government. Id. at 493. Falconwood appeals. We have jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(3) (2000).

II

We review the summary judgment by the Court of Federal Claims de novo. Ammex, Inc. v. United States, 384 F.3d 1368, 1371 (Fed. Cir. 2004). Summary judgment is appropriate where, examined in a light most favorable to the non-movant, the record indicates "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." R. Ct. Fed. Cl. 56(c); see also Fed. R. Civ. P. 56(c) (same).

III

An "affiliated group" of corporations—i.e., one that includes "1 or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation," 26 U.S.C. § 1504(a)(1), provided that certain other stock ownership requirements set forth in section 1504(a) are satisfied— may advantage itself of the privilege of filing a consolidated return in lieu of separate returns for a taxable year if each corporation that has been a member of the group during any part of the taxable year covered by the consolidated return consents, 26

C.F.R. § 1.1502-75(a). At the time of the Mocatta Group's reorganization, the consolidated return must have included "the income of the common parent for that corporation's entire taxable year . . . and . . . the income of each subsidiary for the portion of such taxable year during which it was a member of the group." 26 C.F.R. § 1.1502-76(b)(1).[3] If the group so chose, however, and until it elected to discontinue filing consolidated returns pursuant to 26 C.F.R. § 1.1502-75(c), the group was required to file a consolidated return covering each successive year for which it remained in existence. See 26 C.F.R. § 1.1502-75(a)(2) ("A group which filed (or was required to file) a consolidated return for the immediately preceding taxable year is required to file a consolidated return for the taxable year unless it has an election to discontinue filing consolidated returns under paragraph (c) of this section.").

At the time of the reorganization, "[a] group shall be considered as remaining in existence if the common parent corporation remains as the common parent and at least one subsidiary remains affiliated with it, whether or not such subsidiary was a member of the group in a prior year and whether or not one or more corporations have ceased to be subsidiaries at any time after the group was formed." 26 C.F.R. § 1.1502-75(d)(1).[4]

---

[3] The version of section 1.1502-76(b)(1) now in effect provides that "[a] consolidated return must include the common parent's items of income, gain, deduction, loss, and credit for the entire consolidated return year, and each subsidiary's items for the portion of the year for which it is a member." 26 C.F.R. § 1.1502-76(b)(1)(i) (2005) (emphasis added). In other words, a consolidated return must now include the income of the common parent for the entire consolidated return year rather than for the common parent's entire taxable year. At oral argument, the parties disagreed as to whether the regulation as amended might compel a different result in similar cases. Because that issue is not before the court, we pass no judgment on the applicability of this opinion to cases arising under the regulation as amended.

[4] Section 1.1502-75(d)(1) was amended in 1994 to the version presently in effect, see T.D. 8560, 1994-2 C.B. 200, which now provides that "[a] group remains in

Section 1.1502-75(d)(2)(ii) provided an exception to this general rule where the common parent is no longer in existence but transfers all of its assets "downstream" to a subsidiary:

> The group shall be considered as remaining in existence notwithstanding that the common parent is no longer in existence if the members of the affiliated group succeed to and become the owners of substantially all of the assets of such former parent and there remains one or more chains of includible corporations connected through stock ownership with a common parent corporation which is an includible corporation and which was a member of the group prior to the date such former parent ceases to exist.

26 C.F.R. § 1.1502-75(d)(2)(ii). This exception is squarely at issue in the present case.

Because the Mocatta Group did in fact file a consolidated tax return for the taxable year immediately preceding the one at issue and did not elect to discontinue filing consolidated returns under 26 C.F.R. § 1.1502-75(c), the group was required by law to file a final consolidated return for the short taxable year from April 1, 1986, to December 23, 1986, that included the income of the common parent for that corporation's entire taxable year and the income of each subsidiary for the portion of such taxable year during which it was a member of the group. Prior to the December 23 reorganization, MFC and FSC were subsidiaries. At the conclusion of the reorganization, however, the Mocatta Group no longer existed, and MFC and FSC were each free-standing S corporations. The operations of MFC and FSC from April 1, 1986,

---

existence for a tax year if the common parent remains as the common parent and at least one subsidiary that was affiliated with it at the end of the prior year remains affiliated with it at the beginning of the year, whether or not one or more corporations have ceased to be subsidiaries at any time after the group was formed." 26 C.F.R. § 1.1502-75(d)(1) (2005) (emphasis added). Unlike the version of the regulation in existence at the time of the reorganization at issue in this case, the current regulation necessarily "prevents the group from terminating as the result of a gap in ownership of subsidiaries during a single taxable year." Wessel et al., The Consolidated Group: Continuation and Termination Issues, 434 PLI/Tax 91, 105 (1998).

to December 23, 1986, were thus properly included in the final consolidated return, and their operations subsequent to December 23 were included in separate individual tax returns. The more burdensome task before the Court of Federal Claims was to identify the "income of the common parent for that corporation's entire taxable year," which pursuant to 26 C.F.R. § 1.1502-76(b)(1) was to be included in the Mocatta Group's final consolidated tax return.

The question dispositive to that task is whether the Mocatta Group's December 23, 1986, reorganization from Configuration A to Configuration B satisfied the exception of section 1.1502-75(d)(2)(ii). If the Mocatta Group satisfied the requirements of section 1.1502-75(d)(2)(ii) and thus remained in existence through Configuration B, then for purposes of the section 1.1502-76(b)(1) requirement that the final consolidated return include the income of the common parent for that corporation's entire taxable year, "the former common parent shall be deemed to continue in existence and shall be regarded as the common parent for the entire taxable year in which the acquisition occurs." 26 C.F.R. § 1.1502-76(b)(1). The taxable year of the common parent—the product of the TMCH/Falconwood downstream merger—then would not end until March 31, 1987, and any loss sustained post-December 23 by that entity properly would be included in the consolidated tax return for the shortened tax year ending on December 23, 1986. If instead the Mocatta Group did not satisfy the exception in section 1.1502-75(d)(2)(ii) and thus did not remain in existence through Configuration B, then TMCH, the common parent, and its taxable year would terminate on December 23, 1986, when TMCH itself merged "downstream" into Falconwood and

out of existence. In that case, any losses sustained by Falconwood post-merger could not have been included in the group's final consolidated tax return.

As discussed, the Court of Federal Claims ruled that the Mocatta Group did not satisfy the section 1.1502-75(d)(2)(ii) exception. The court based its decision both on its interpretation of the terms "there remains" in the section and on an application of the step transaction doctrine to combine the several steps of the reorganization into a single transaction for purposes of determining tax liability. We address each in turn.

A

Relying heavily on the decision of our predecessor court in Union Electric Co. of Missouri v. United States, 305 F.2d 850, 854 (Ct. Cl. 1962), the Court of Federal Claims first determined that the existence of the subsidiaries MFC and FSC for approximately three hours after the downstream merger of TMCH into Falconwood did not satisfy the requirement of continuity, which the Court of Federal Claims found to be rooted in the terms "there remains" in section 1.1502-75(d)(2)(ii). Falconwood, 60 Fed. Cl. at 490-91 (opining that "it is clear that the existence of subsidiaries for only three hours following the downstream merger does not satisfy the requirement of continuity 'from one year to the subsequent year,' or 'continued existence,' set forth in Union Electric"). The Court of Federal Claims thus determined that "there remains" requires the "continued existence of at least one subsidiary in the status of a subsidiary from one year to the subsequent year." Id. at 490 (quoting Union Elec., 305 F.2d at 855). The Court of Federal Claims's reliance upon Union Electric was misplaced.

In Union Electric, The North American Company ("North American") was the common parent of a corporate group consisting of approximately eighty corporations engaged in a number of various business activities. 305 F.2d at 850. Beginning in 1942, North American filed consolidated tax returns with its subsidiaries. Id. During the years 1950 through 1953, however, four subsidiary corporations in the North American chain were eligible, as regulated public utility corporations—those that derive at least 80 percent of their gross income (excluding dividends and capital gains/losses) from certain utilities operations—to elect a special excess profits tax credit, provided in the Excess Profits Tax Act of 1950 ("EPTA"), 26 U.S.C. § 448 (1952). Id. at 851-52. Pursuant to the EPTA, North American was also eligible to and did join the subsidiaries in filing a consolidated tax return for the years 1950 through 1952. Id. at 852. The remaining corporations in the North American chain were not eligible for the tax credit and thus filed separate, individual tax returns covering those years. Id.

In 1953 and 1954, North American had no income from regulated public utility sources and was consequently precluded by the EPTA from joining the four public utility subsidiaries in filing a consolidated tax return for those years. Id. North American ultimately joined with an entirely different group of subsidiaries to file consolidated tax returns. Id.

The successor to North American later brought an action for the refund of overpayments of income tax, claiming that it was entitled to deduct from the consolidated net income of the North American utilities group in 1952 losses attributable to North American for the miscellaneous group of corporations that joined in filing

consolidated tax returns in 1953 and 1954. Id. at 853. The question presented in Union Electric was thus whether a parent corporation was part of one affiliated group which remained continuously in operation during the years 1952 through 1954 or two separate affiliated groups, where no subsidiary corporation included on the 1952 consolidated tax return remained affiliated with the parent corporation during 1953 and 1954. Id. In other words, the court considered whether the 1952 group remained in existence through 1953 and 1954 solely by virtue of the fact that the common parent remained consistent throughout.

In determining that it did not, the court examined Treasury Regulations 129 § 24.11(c) and (d), as promulgated in 1951 under the 1939 Code:

> Sec. 24.11. Consolidated Returns for Subsequent Years
> . . . .
> (c) When affiliated group remains in existence.
> For the purpose of these regulations, an affiliated group shall be considered as remaining in existence if the common parent corporation remains as a common parent and at least one subsidiary remains affiliated with it, whether or not such subsidiary was a member of the group at the time the group was formed and whether or not one or more corporations have become subsidiaries or have ceased to be subsidiaries at any time after the group was formed.
> (d) When affiliated group terminates.
> For the purpose of these regulations, an affiliated group shall be considered as terminated if the common parent corporation ceases to be the common parent or there is no subsidiary affiliated with it.

The court first noted that the prescriptions of subsections 24.11(c) and (d) are provided only to determine whether an affiliated group of corporations that files a consolidated return in one year continues in existence to the subsequent year for purposes of determining whether the group is required to file a consolidated return covering operations during the subsequent year. 305 F.2d at 854 ("They do not purport to define the composition of the group or the existence of the group generally."). The court next

determined that the word "remains" in the regulations required that at least one of the affiliated corporations constituting subsidiaries in 1952 remained affiliated with the parent corporation in 1953 and 1954 in order for the group in 1952 to continue in existence through the subsequent two years.  Id. at 855.  Because none did, the court held that the carrybacks claimed by the successor to North American were not allowable.  Id. at 855.

The question posed to the court in Union Electric is therefore quite distinct from that now before this court.  The Union Electric court's interpretation of "remains" to require the continued existence of at least one subsidiary from one year to the next was very much appropriate in light of the context of the regulation from which the term came, a regulation promulgated to define whether or not an affiliated group on whole continues in existence from one year to the next.  That regulation necessarily contemplates a comparison only of the physical make-up of a group of corporations from one year to the next and was part of a regulatory scheme that contained no downstream merger exception to the rules then governing whether an affiliated group remained in existence.  The regulation at issue here contemplates an altogether different comparison of the make-up of a group as it exists both prior to and subsequent to a downstream merger of the former common parent corporation into its subsidiaries.  We therefore cannot impute so easily the Union Electric court's "from one year to the subsequent year" interpretation to "there remains" in section 1.1502-75(d)(2)(ii).

ii

Without dispositive benefit from Union Electric, the government is left to argue that the three hours in which the group "remained" after the downstream merger of

TMCH into Falconwood simply does not suffice under the regulation. Indeed, in its brief, the government recognizes that some passage of time would be enough to save the consolidated group, and that "a close case may one day arise" which calls for a more precise line between where "enough" time succeeds and "not enough" time fails. (Appellee's Br. at 36.) But the government concludes that "this is not such a case." Id. We cannot agree that there is any principled difference between the three-hour time period in this case and the passage of days or weeks or months in some other case where there could be no reasonable doubt about the satisfaction of the "there remains" test.

Because the government chose not to define in section 1.1502-75(d)(2)(ii) more expressly the temporal span of "there remains," we think it inappropriate to accord the terms anything more than their plain meaning. See Gould v. Gould, 245 U.S. 151, 153 (1917) ("In the interpretation of statutes levying taxes it is the established rule not to . . . enlarge their operations so as to embrace matters not specifically pointed out. In case of doubt they are construed most strongly against the government, and in favor of the citizen."); Int'l Tel. & Tel. Corp. v. United States, 608 F.2d 462, 477 (Ct. Cl. 1979) ("Consolidated return regulations are 'legislative' in character and have the force and effect of law."). To "remain" is "to continue unchanged in form, condition, status, or quantity : continue to be." Webster's Third New International Dictionary 1919 (3d ed. 1993); see also The American Heritage Dictionary of the English Language 1475 (4th ed. 2000) ("To continue in the same state or condition"; "To be left after the removal, loss, passage, or destruction of others").

04-5111                          15

Though the ordinary meaning of the word "remain" when considered in the context of section 1.1502-75(d)(2)(ii) clearly forecloses the sufficiency of a simultaneous transaction to maintain a group's existence, it also presupposes no particular passage of time, e.g., no requirement that something "continues to be for three hours." Rather, the plain meaning of the regulation requires only that there continues to be after the downstream merger one or more chains of includible corporations connected through stock ownership with a common parent corporation that was a member of the group prior to the date the former parent corporation ceased to exist. In keeping with that meaning, we hold on the facts of this case that because Falconwood was a member of the Mocatta Group prior to the date TMCH ceased to exist and became the owner of substantially all of the assets of TMCH, and because both MFC and FSC remained connected through stock ownership to Falconwood after TMCH's downstream merger, albeit only for several hours, the downstream merger here sufficed to preserve the group's existence through Configuration B.

B

We next turn our attention to the application by the Court of Federal Claims of the step transaction doctrine to collapse the Mocatta Group's reorganization into a single step from Configuration A to Configuration C.

i

The step transaction doctrine is a judicial manifestation of the more general tax law ideal that effect should be given to the substance, rather than the form, of a transaction, "by ignoring for tax purposes, steps of an integrated transaction that separately are without substance." Dietzsch v. United States, 498 F.2d 1344, 1346 (Ct.

Cl. 1974); see also King Enters., Inc. v. United States, 418 F.2d 511, 516 n.6 (Ct. Cl. 1969) ("[C]ourts have enunciated a variety of doctrines, such as step transaction, business purpose, and substance over form. Although the various doctrines overlap and it is not always clear in a particular case which one is most appropriate, their common premise is that the substantive realities of a transaction determine its tax consequences."). The Supreme Court has expressly sanctioned the step transaction doctrine, noting that "interrelated yet formally distinct steps in an integrated transaction may not be considered independently of the overall transaction." Comm'r v. Clark, 489 U.S. 726, 738 (1989); see also Comm'r v. Court Holding Co., 324 U.S. 331, 334 (1945) ("To permit the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities, would seriously impair the effective administration of the tax policies of Congress."); Griffiths v. Helvering, 308 U.S. 355, 358 (1939) ("Taxes cannot be escaped 'by anticipatory arrangements and contracts however skillfully devised . . . by which the fruits are attributed to a different tree from that on which they grew.'" (quoting Lucas v. Earl, 281 U.S. 111, 115 (1930))); Minn. Tea Co. v. Helvering, 302 U.S. 609, 613 (1938) ("A given result at the end of a straight path is not made a different result because reached by following a devious path."); Gregory v. Helvering, 293 U.S. 465 (1935). We too have noted that the objective of the doctrine is to "give tax effect to the substance, as opposed to the form of a transaction, by ignoring for tax purposes, steps of an integrated transaction that separately are without substance." Dietzsch, 498 F.2d at 1346.

Though "there is no universal test applicable to step transaction situations," King, 418 F.2d at 516, courts generally have enunciated three basic tests that define the

criteria upon which application of the step transaction doctrine applies—the "interdependence test," the "end result test," and the "binding commitment test." The interdependence test "requires an inquiry as to whether . . . the steps were so interdependent that the legal relations created by one transaction would have been fruitless without a completion of the series." Id. (quotation marks omitted). The end result test examines whether it appears that separate transactions were "really component parts of a single transaction intended from the outset to be taken for the purpose of reaching the ultimate result." Id. (quotation marks omitted). The binding commitment test examines whether there was a "binding commitment to undertake the later step" in a series of transactions.[5] Penrod v. Comm'r, 88 T.C. 1415, 1429 (1987).

In King, we further noted that various expressions of the step transaction doctrine may have different meanings in different contexts, and that there "may be not one rule, but several, depending on the substantive provision of the Code to which they are being applied." King, 418 F.2d at 516 (quotation marks omitted).

Various opinions from the United States Tax Court have seemingly overlaid additional layers of analysis onto the three tests, stating that the doctrine eviscerates meaningless steps in a transaction, Esmark, Inc. v. Comm'r, 90 T.C. 171, 195 (1988) ("combines a series of individually meaningless steps into a single transaction"), and

---

[5]     Courts have not often applied the binding commitment test. See Joshua D. Rosenberg, Tax Avoidance and Income Measurement, 87 Mich. L. Rev. 365, 406 (1988) ("[C]ourts, commentators, and the Internal Revenue Service have generally rejected the use of the binding-commitment test."). Indeed, the binding commitment test was squarely rejected by our predecessor court in King. See King, 418 F.2d at 518 (stating that "the step transaction doctrine would be a dead letter if restricted to situations where the parties were bound to take certain steps" and refusing to apply the test).

04-5111                                              18

does not apply "when the result of the steps is what is intended by the parties and fits within the particular statute, and when each of the several steps and the timing thereof has economic substance and is motivated by valid business purposes," Tandy Corp. v. Comm'r, 92 T.C. 1165, 1173 (1989) (emphasis added). See also Portland Mfg. Co. v. Comm'r, 56 T.C. 58, 77 (1971) ("The artificiality of the transaction is apparent when . . . assets moved through the corporate hands . . . in a matter of days, never pausing long enough to serve any business purpose, until they reached their ultimate destination . . . .").

Other courts have rejected the notion that a valid business purpose necessarily bars application of the step transaction doctrine. See Aeroquip-Vickers, Inc. v. Comm'r, 347 F.3d 173, 183 (6th Cir. 2003) ("Here, although the individual steps of the transaction had a legitimate business reason, the transaction must be treated as a single unit and judged by its end result."); True v. United States, 190 F.3d 1165, 1177 (10th Cir. 1999) (stating that a non-tax "business purpose by itself does not preclude application of the step transaction doctrine"); Kuper v. Comm'r, 533 F.2d 152, 158 (5th Cir. 1976) ("A legitimate business goal does not grant taxpayer carte blanche to subvert Congressionally mandated tax patterns."); S. Bay Corp. v. Comm'r, 345 F.2d 698, 704 (2d Cir. 1965) ("[I]t must be doubted that the degree of integration requisite . . . can, or ought to, go to the extreme of requiring that each step be devoid of business significance unless united with one or more of the other steps."). But cf. Del Commercial Props., Inc. v. Comm'r, 251 F.3d 210, 213-14 (D.C. Cir. 2001) ("Under the step-transaction doctrine, a particular step in a transaction is disregarded for tax purposes if the taxpayer could have achieved its objective more directly, but instead

included the step <u>for no other purpose</u> than to avoid U.S. taxes." (emphasis added)).

Still others have considered an independent business purpose as part of the "sham transaction doctrine," a sister corollary of the same basic substance-over-form principle that gives rise to the step transaction doctrine. <u>See</u> <u>Frank Lyon Co. v. United States</u>, 435 U.S. 561, 580 (1978) (holding that the transaction at issue was not a simple sham); <u>see also</u> <u>Winn-Dixie Stores, Inc. v. Comm'r</u>, 254 F.3d 1313, 1316 (11th Cir. 2001) (stating that the sham transaction doctrine "provides that a transaction is not entitled to tax respect if it lacks economic effects or substance other than the generation of tax benefits, or if the transaction serves no business purpose"); <u>True</u>, 190 F.3d at 1177 n.11 (stating that "the sham transaction doctrine focuses on whether a questionable transaction has a business purpose and economic effects other than the creation of tax benefits"); <u>DeMartino v. Comm'r</u>, 862 F.2d 400, 406 (2d Cir. 1988) ("A transaction is a sham if it is fictitious or if it has no business purpose or economic effect other than the creation of tax deductions.").

The Tenth Circuit has further explained that:

The law is unclear as to the relationship between the step transaction doctrine and the business purpose requirement. Our survey of the relevant cases suggests that no firm line delineates the boundary between the two. Most cases applying the step transaction doctrine, far from identifying business purpose as an element whose <u>absence</u> is prerequisite to that application, do not even include discussion of business purpose as a related issue. In some cases, the existence of a business purpose is considered one factor in determining whether form and substance coincide. In others, the lack of business purpose is accepted as reason to apply the step transaction doctrine. We have found no case holding that the existence of a business purpose precludes the application of the step transaction doctrine.

<u>Associated Wholesale Grocers, Inc. v. United States</u>, 927 F.2d 1517, 1526-27 (10th Cir. 1991) (footnotes omitted).

That the Mocatta Group had an independent business purpose for the downstream merger in this case, which resulted in the structure of Configuration B, is not in dispute. The downstream merger avoided "the risk and delay incident to obtaining regulatory approval of a transfer of [Falconwood's] seats, or options to purchase seats," on various commodities exchanges. Falconwood, 60 Fed. Cl. at 487 n.7. In light of existing case law, what is less clear is the weight to be given that independent purpose in determining whether to ignore for tax purposes certain steps of the Mocatta Group's reorganization.

ii

We hold on the facts of this case that the regulations at issue leave no room for an application of the step transaction doctrine, where the Mocatta Group proceeded to Configuration B for an independent business purpose and was thereafter bound to follow the consolidated return regulations at issue.

Congress has expressly delegated to the Secretary of the Treasury the authority to promulgate regulations necessary to determine and collect the tax liability of an affiliated group of corporations. See 26 U.S.C. § 1502 ("The Secretary shall prescribe such regulations as he may deem necessary in order that the tax liability of any affiliated group of corporations making a consolidated return . . . may be returned, determined, computed, assessed, collected, and adjusted . . . ."); United Dominion Indus., Inc. v. United States, 532 U.S. 822, 826 (2001) (stating that the Code permits an affiliated group to file a single consolidated return and "leaves it to the Secretary of the Treasury to work out the details by promulgating regulations governing such returns"); Rite Aid Corp. v. United States, 255 F.3d 1357, 1359 (Fed. Cir. 2001) (discussing the legislative

history behind the delegation of authority to promulgate consolidated return regulations). The resulting regulations "unlike ordinary Treasury Regulations, are legislative in character and have the force and effect of law." Union Elec., 305 F.2d at 854; see also Nichols v. United States, 260 F.3d 637, 648 (6th Cir. 2001) (stating that the regulations pertaining to consolidated returns are "legislative in nature and have the force and effect of law"); Conn. Gen. Life Ins. Co. v. Comm'r, 177 F.3d 136, 143 (3d Cir. 1999) (calling the regulations "legislative in character"). As the government notes in its brief on appeal, the Mocatta Group was thus bound to abide by them. (Br. of Appellee at 26.)

Indeed, the express terms of the particular regulations at issue here belie any notion that compliance by the Mocatta Group was discretionary. Having successfully succeeded to the assets of TMCH, in part to avoid the cost and delay in transferring various exchange seats, and having remained connected through stock ownership to MFC and FSC prior to the ultimate termination of the group, the Mocatta Group was "required to file a consolidated return for the taxable year," 26 C.F.R. § 1.1502-75(a)(2) (emphasis added), and "must include the income of the common parent for that corporation's entire taxable year," id. § 1.1502-76(b)(1) (emphasis added). Upon completing a downstream merger for independent business reasons, Falconwood therefore had little choice in the face of quasi-legislative mandates but to file a final consolidated tax return for the group that covered Falconwood's operations for its entire taxable year. In this context, we thus place great weight on the existence of a business purpose independent of the associated tax consequences, for pursuit of that purpose led Falconwood down a regulatory path from which there were no exits.

Because the regulations brook no discretion on the part of Falconwood in filing a consolidated tax return once the Mocatta Group proceeded to Configuration B, a move motivated by an independent business purpose, we think it correct to require both parties, turning square corners, to live with the end result of Falconwood's regulatory compliance.[6] See Granite Trust Co. v. United States, 238 F.2d 670, 675 (1st Cir. 1956) (noting that applicable regulations "emphasize the rigid requirements of the section and make no allowance for the type of 'step transaction' theory advanced in this case"); CSI Hydrostatic Testers, Inc. v. Comm'r, 103 T.C. 398, 411 (1994) ("[W]e will apply the consolidated return regulations and the Code as written."), aff'd, 62 F.3d 136 (5th Cir. 1995). We thus determine that an independent business purpose precludes application of the step transaction doctrine in the context of the particular regulatory scheme at issue here, where having satisfied the prescripts of section 1.1502-75(d)(2)(ii) and thus surviving the downstream merger, Falconwood was left with no option but to comply with the consolidated return regulations by including its operations through March 31, 1987, in the Mocatta Group's final consolidated return.[7]

---

[6]    The government stated at oral argument that the Commissioner of Internal Revenue enjoys what amounts to unfettered discretion to apply the step transaction doctrine in those cases where its application would benefit the government—a one-way ratchet of sorts. But Treasury cannot with one hand promulgate consolidated return regulations that have the force and effect of statutory law, and, with the other, require a taxpayer under the guise of the step transaction doctrine to proceed contrary to the regulations but only when to the government's benefit. That is the practical effect of what the government purports to do here.

[7]    Hypothetically, had Falconwood merged upstream into TMCH such that TMCH was the surviving entity, TMCH would have remained as the parent corporation throughout the merger and until the Mocatta Group reached Configuration C. Section 1.1502-76(b)(1) would then require TMCH to cover its operations through March 31, 1987, in the group's final consolidated return. Interestingly, an application of the step transaction doctrine to remove Configuration B from the reorganization process and

IV

Reading no temporal requirement into the exception of section 1.1502-75(d)(2)(ii) for the continued existence of an affiliated group despite the downstream merger of the former parent corporation, we conclude that the step transaction doctrine cannot override the statutory and regulatory context governing consolidated tax returns from which this case arises. The Court of Federal Claims erred in granting summary judgment in favor of the government that Falconwood may not in this case invoke the section 1.1502-75(d)(2)(ii) exception to affiliated group continuity rules. We find instead that Falconwood's invocation was proper. In so doing, we have considered the government's arguments not addressed expressly in this opinion and find them

thus collapse the reorganization into one primary step from Configuration A to Configuration C presumably would not have precluded TMCH from covering its operations for the full taxable year in the group's final return. This is so because even if Configuration B were ignored for tax purposes, TMCH and its taxable year would have survived termination of the group upon reaching Configuration C, and "the income of the common parent for that corporation's entire taxable year," TMCH's tax year ending on March 31 in the hypothetical, must be included in the group's final consolidated tax return. 26 C.F.R. § 1.1502-76(b)(1).

Our holding thus avoids the peculiar result of the Court of Federal Claims's judgment in this case that in one scenario, TMCH's downstream merger into Falconwood for an independent business purpose allows for the application of the step transaction doctrine to alter the associated tax consequences of the reorganization, whereas in another, Falconwood's upstream merger into TMCH would not. The substantive outcome is the same under both scenarios—the product of the Falconwood/TMCH merger and its taxable year survive termination of the group at Configuration C. But the associated tax consequences under the Court of Federal Claims's judgment as explained are quite different, depending upon which of the two scenarios becomes reality. Such a result would turn on its head a doctrine that when used properly elevates the substance of a transaction over its form. See Brown v. United States, 329 F.3d 664, 671 (9th Cir. 2003) ("substance should prevail over form" (quotation marks omitted)); King, 418 F.2d at 517 (stating that the doctrine assures that "tax consequences turn on the substance of a transaction rather than on its form").

unpersuasive.  Accordingly, we reverse the ruling of the Court of Federal Claims and remand for a determination of the refund due Falconwood.

<u>REVERSE AND REMAND</u>