Edward E. GATZ and Donald D. Graham, individually and on behalf of those similarly situated, and derivatively on behalf of Regency Affiliates, Inc., Plaintiffs Below, Appellants,

v.

William R. PONSOLDT, Sr., Statesman Group, Inc., William R. Ponsoldt, Jr., Marc H. Baldinger, Stephanie Carey, Martin J. Craffey, Royalty Holdings, L.L.C., Royalty Management, Inc., Laurence Levy, Neil N. Hasson, Stanley Fleishman, Errol Glasser and Regency Affiliates, Inc., Defendants Below, Appellees.

No. 298,2006.

Supreme Court of Delaware.

Submitted: Dec. 13, 2006.
Decided: April 16, 2007.
Reargument Denied May 17, 2007.

Alan J. Stone, R. Judson Scaggs, Jr. (argued), Jerry C. Harris, Jr. and Jay N. Moffitt, Esquires, of Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Of Counsel: Thomas H. Dahlk, Michael S. Degan and Trenten P. Bausch, Esquires of Blackwell Sanders Peper Martin, Omaha, Nebraska; for Appellants.

Daniel V. Folt (argued), Gary W. Lipkin and Matt Neiderman, Esquires, of Duane Morris LLP, Wilmington, Delaware; for Appellees William R. Ponsoldt, Sr., William R. Ponsoldt, Jr., Marc H. Baldinger, Stephanie Carey and Martin J. Craffey.

Kevin R. Shannon and Brian C. Ralston, Esquires, of Potter Anderson & Corroon LLP, Wilmington, Delaware; for Appellee Statesman Group, Inc.

Gregory P. Williams, Evan O. Williford and Charles A. McCauley, III, Esquires, of Richards, Layton & Finger, P.A., Wilmington, Delaware; for Appellees Laurence Levy, Royalty Holdings, L.L.C. and Royalty Management, Inc.

Todd C. Schlitz, Esquire of Wolf Block Schorr & Solis–Cohen LLP, Wilmington, Delaware; for Appellee Regency Affiliates, Inc.

Before STEELE, Chief Justice, HOLLAND, BERGER, RIDGELY, Justices, constituting the Court en Banc.

JACOBS, Justice.

The plaintiffs-below, appellants ("Appellants"), who are minority public stockholders of Regency Affiliates, Inc., a Delaware corporation ("Regency"), appeal from the dismissal of this action by the Court of Chancery. The complaint, which Appellants brought on behalf of all Regency shareholders other than the defendants and affiliated persons, alleges claims arising out of several transactions that occurred between 1992 and 2004. This appeal involves dismissed claims generated by two of those transactions: the "Recapitalization," which occurred in 2002, and the "Aggregate Sale," which occurred in 2001. Both transactions are described in Part I of this Opinion.

In a Memorandum Opinion dated November 5, 2004, the Court of Chancery granted the defendants' motion to dismiss the claims relating to the Recapitalization, holding that those claims were derivative and that the Appellants had failed to make a Rule 23.1 pre-suit demand on Regency's board of directors. The Chancellor declined, however, to dismiss the claim relating to the Aggregate Sale, finding that claim to be direct and, thus, not subject to Rule 23.1's demand requirement.[1] In February 2005, the defendants again moved to dismiss the Aggregate Sale claim, on the basis that the claim was moot because that transaction had been "unwound." By letter opinion dated October 14, 2005, the Court dismissed the Aggregate Sale claim, but with leave for Appellants to amend their complaint.[2] The Appellants filed an amended complaint, which the defendants then moved to dismiss on Rule 23.1 demand grounds. By letter Opinion dated May 26, 2006, the Court of Chancery held that the Aggregate Sale claim as alleged in the amended complaint was derivative. The Court dismissed the claim,[3] which resulted in the action being dismissed in its entirety.

---

1. *Gatz v. Ponsoldt,* 2004 WL 3029868 (Del. Ch.) ("2004 Mem. Op.").

2. *Gatz v. Ponsoldt,* 2005 WL 2709640 (Del. Ch.) ("2005 Ltr. Op.").

3. *Gatz v. Ponsoldt,* 2006 WL 1510467 (Del. Ch.) ("2006 Ltr. Op.").

Although the Chancellor found that the claims at issue were derivative based on the then-existing case law, an intervening legal development occurred while this appeal was pending: this Court decided *Gentile v. Rossette*, a case that bore importantly on the issue of whether the dismissed claims were derivative, direct, or both.[4] Having heard the parties on the impact of *Rossette*, we conclude that the claims before us are not exclusively derivative and could be brought directly. It therefore follows that the Court of Chancery's contrary conclusions were legally erroneous. Accordingly, we reverse and remand the case to the Court of Chancery for further proceedings consistent with this Opinion.

## I.  *FACTS*

### A.  *Overview*

To describe meaningfully the transactions that generate the issues presented, we first narrate the background events that led to the Recapitalization. The end result of those events was that William R. Ponsoldt, Sr. ("Ponsoldt"), through entities owned or controlled by him, acquired a sizeable minority block of Regency shares, that gave him *de facto* control of that company.  Those background events, in turn, set the stage for the Recapitalization, an intricate transaction negotiated by Ponsoldt and Lawrence Levy ("Levy"), and carried out without any approval by Regency's public shareholders, that enabled Ponsoldt to cash out most of his equity interest in Regency and to convert his *de facto* stock control of Regency into an absolute majority interest that simultaneously was transferred to an entity owned by Levy. The end result was that Regency's public shareholders—who previously had held Regency's majority stock interest—became minority shareholders in a Levy-controlled enterprise.

### B.  *Background Events* [5]

Regency is a publicly traded corporation that, in 1992, had emerged from bankruptcy with few assets other than considerable net operating tax loss carry forwards ("NOLs").  In July 1993, Regency entered into a transaction with Statesman Group, Inc. ("Statesman"), a Bahamian corporation whose stock is held by the Statesman Irrevocable Trust, a trust that was settled by Ponsoldt.  Through his control of the Trust, Ponsoldt controlled Statesman.[6]  In that transaction, a Regency subsidiary, NRDC Delaware ("NRDC"),[7] acquired

---

**4.**  906 A.2d 91 (Del.2006).

**5.**  Most of the facts recited here, all drawn from the allegations of the complaint, are summarized in the Court of Chancery's 2004 Memorandum Opinion.

**6.**  Statesman contended in the Court of Chancery, and contends also in this Court, that Ponsoldt does not control Statesman because under trust law he does not control the Statesman Irrevocable Trust.  Although on a fully developed factual record that may turn out to be the case, at this stage the Appellants have alleged facts from which Ponsoldt's control of Statesman can be reasonably inferred. The complaint alleges that Ponsoldt negotiated and acted on behalf of Statesman from the time Statesman first obtained its interest in Regency through the time of the Recapitalization.  Ponsoldt was Levy's direct contact when Levy became interested in purchasing Statesman's Regency common stock.  Nothing in the record shows that Levy ever dealt with the bank trustee that Statesman contends controlled Statesman, or that that unnamed bank trustee was involved in any of the transactions involving Statesman.  In its Memorandum Opinion, the Chancellor properly inferred that "Statesman was led by defendant William Ponsoldt[;]" and that "[t]he Statesman Irrevocable Trust, settled by Ponsoldt, allegedly controls Statesman."  2004 Mem. Op., 2004 WL 3029868 at *1 n. 3.

**7.**  In this transaction, NRDC became 80% owned by Regency, with Statesman holding the remaining 20% interest in NRDC.

Statesman's interest in 75 million tons of rock ("the Aggregate"), in exchange for which Regency transferred to Statesman: (i) 28.73% of Regency's outstanding common stock, (ii) irrevocable proxies to vote an additional 5% of Regency's common stock, and (iii) 100% of Regency Series C Preferred Stock (the "Series C Preferred"). The Series C Preferred carried redemption and liquidation rights that were tied to the value of the Aggregate which, at that point in time, was valued for financial statement purposes at $15 million.

This transaction enabled Statesman (acting through Ponsoldt) to designate persons to fill vacancies on Regency's board of directors. Among those Statesman designees were defendants below, appellees William Ponsoldt, Jr., who was Ponsoldt's adult son ("Ponsoldt, Jr."), Stephanie Carey and Martin Craffey, all three of whom served as Regency directors until October 2002. At the time they were appointed as directors, Ponsoldt, Jr. and Craffey received options from Statesman to purchase Regency Series C Preferred shares, and Carey received 100,000 shares of Regency common stock from Statesman.[8]

One year later, in late 1994, Regency acquired a partnership interest in Security Land Development Company L.P. ("Security Land"), a partnership that owned a large office building in Maryland leased by the United States Social Security Administration ("SSA"). In that transaction, Regency acquired the right to receive 95% of Security Land's profits through 2003, and 50% of those profits thereafter. In exchange, Regency provided Security Land with $300,000 in capital and over $60 million in NOLs. The NOLs effectively sheltered the over $12 million annual rent being generated by the SSA from income tax.

In August 1996, two years after the Security Land transaction, Ponsoldt was elected Chairman of the Regency board of directors. Ponsoldt then fired the existing CEO and President and a search for a new chief executive began. On June 3, 1997, the Regency board, without looking far, hired Ponsoldt as CEO and President. Ponsoldt's base compensation was $250,000 per year with annual cost of living increases, plus additional salary based on the overall net worth of Regency.[9] That same day (June 3, 1997), the Regency board granted to Statesman an option allowing Statesman to acquire 6.1 million shares of Regency common stock. Although Ponsoldt represented in 1997 that that option would be exercised only to prevent a hostile takeover of Regency, Statesman exercised the option in October 2001, four years later, when no hostile takeover was threatened.

During the summer of 2001, Ponsoldt began negotiations with Laurence Levy, the sole director, sole stockholder, and president of Royalty Management, Inc., a Delaware corporation. Royalty Management was the managing member of Royalty Holdings, L.L.C., a Delaware limited liability company ("Royalty").[10] The nego-

---

8. Later, in August 1999, defendant below, appellee Marc Baldinger became a member of the Regency board and served as Regency's Chief Financial Officer. The directors of Regency at the time of the Recapitalization, namely, Ponsoldt, Ponsoldt, Jr., Baldinger, Carey, and Craffey, together with nominal defendant Regency Affiliates, Inc., are collectively referred to in this Opinion as the "Ponsoldt defendants."

9. According to the complaint, the Security Land transaction was structured so as to continually increase Regency's asset value, such that Ponsoldt's salary increased as time progressed.

10. Levy, Royalty, and Royalty Management are referred to collectively in this Opinion as the "Levy Defendants."

tiations between Ponsoldt and Levy ulti-mately led to the Recapitalization transaction that took place on October 17, 2002. To set the stage for the Recapitalization, Ponsoldt orchestrated several intermediate transactions that are next described.

As earlier noted, on October 15, 2001, Statesman exercised its option to acquire 6.1 million common shares of Regency, in exchange for delivering to Regency a promissory note representing the $2.44 million exercise price. The effect of Statesman's exercise of that option was to reduce the percentage ownership of the public shareholder class that plaintiffs purport to represent from 89.1% to 61.1%.[11]

## B. *The Aggregate Sale and Other Events Leading Up To The Recapitalization*

Two months later, in December 2001, the Regency subsidiary that held the Aggregate (NRDC) was caused to sell the Aggregate to another Regency subsidiary (Iron Mountain Resources) for an eight year promissory note in the principal amount of $18.2 million. The note was payable, beginning December 2003, at 2.46% interest, in 96 equal installments. According to the complaint, this "Aggregate Sale" was intended to increase artificially the value of the Regency Series C Preferred stock held by Statesman (the value of the Series C stock being tied to the value of the Aggregate). One month later, Ponsoldt orchestrated the adoption by Regency of a 1–for–10 reverse stock split, and the reduction of the par value of Regency common stock from $.40 per share to $.01 per share.

Since 2001, Ponsoldt had been pursuing ways to generate cash to fund both his retirement and Statesman's divestiture of its interest in Regency. Initially Ponsoldt attempted to sell either Statesman's Series C Preferred or the Aggregate itself to Levy, but Levy's interest was in monetizing (*i.e.*, cashing out) Regency's partnership interest in Security Land. In pursuit of Levy's desire, in June of 2002, Regency attempted to restructure its interest in Security Land, in a transaction that would have involved: (i) a $2 million loan from the non-Regency partners of Security Land to Regency; (ii) an amendment to the Security Land partnership agreement that would reduce Regency's proportionate share of the proceeds of a sale or refinancing of the office building owned by Security Land, and (iii) granting an option to the non-Regency partners of Security Land to purchase Regency's partnership interest at a price between $36 million and $38.5 million.

In April 2002, Regency publicly disclosed the Aggregate Sale. That disclosure prompted the Appellants to bring a lawsuit in a Nebraska federal court, asserting claims under the federal RICO statute and under state law (including breach of fiduciary duty claims), against Ponsoldt, Regency's other directors, and Statesman.[12] The Nebraska action challenged (*inter alia*) the validity of the transaction that resulted in Statesman holding 6.1 million shares of Regency common stock. The pendency of that action prevented Statesman from selling its shares to Royalty, and obstructed Levy's plan to monetize Regency's assets, and

11. The Statesman $2.44 million note was never paid, and was canceled as part of the Recapitalization.

12. In July 2003, the Nebraska federal court transferred the case to the United States District Court for the District of Delaware, which, in December 2003, dismissed the

RICO claims under Federal Rule 12(b)(6), and Appellants' other claims for lack of federal subject matter jurisdiction. *Gatz v. Ponsoldt*, 271 F.Supp.2d 1143 (D.Neb.2003); *Gatz v. Ponsoldt*, 297 F.Supp.2d 719 (D.Del. 2003). The dismissal by the Delaware District Court led to the filing of this action in the Court of Chancery in February 2004.

resulted in an order by a federal magistrate judge that prevented Regency from entering into a transaction that would monetize Regency's interest in Security Land. On September 11, 2002, upon the Ponsoldt defendants' representation that a monetization of Regency's interest in Security Land was essential to the Company's continued financial health, that order was modified to allow such a transaction to proceed on certain conditions.

After the modification of the federal magistrate's order, the plaintiffs offered to provide Regency with $17 million or more in credit on favorable terms, allegedly to avoid forfeiting Regency's rights to share in the proceeds of a sale or refinancing of the office building owned by Security Land, and also to prevent further dilution of the public shareholders' interest. The Ponsoldt defendants disregarded that offer. Instead, on September 30, 2002— almost immediately after the plaintiffs had communicated their offer—Levy forwarded to Regency a proposal that culminated months of private negotiations with Ponsoldt, and that eventually became the Recapitalization transaction.

That same day, the Regency board appointed a three-member special committee, consisting of defendants Baldinger, Carey and Craffey, to analyze Levy's proposal. The complaint alleges that the special committee process was a sham, because none of the committee members was disinterested or independent of Ponsoldt. Specifically: (1) both Carey and Baldinger had extensive ties to Ponsoldt, Ponsoldt, Jr., and Statesman from previous business and personal dealings; moreover, unbeknownst to the other special committee members, Craffey received a $100,000 payment from Statesman shortly after he voted to ap-

prove the Recapitalization; (2) the special committee did not retain a financial advisor, or obtain current valuations of Regency's interest in Security Land or any of its assets, or secure an analysis of the effect of the Recapitalization on Regency's per share book value; (3) defendants Baldinger and Ponsoldt did not furnish the special committee with all the material information necessary to analyze the transaction;[13] and (4) the special committee was biased against the plaintiffs' alternative proposal. In any event, the special committee voted to approve the Recapitalization, which closed on October 17, 2002 and is next described.

## C. *The Recapitalization*

### 1. *Summary of the Transaction*

The Recapitalization involved three entities: Royalty (owned and controlled by Levy), Regency and Statesman (the latter two entities controlled *de facto* by Ponsoldt). The terms of the transaction (which were never submitted to Regency shareholders for a vote) were as follows:

(1) Royalty financed the transaction, by loaning $4.75 million cash to Regency. In exchange, Royalty received $4.75 million of Regency promissory notes, including: (i) a $3.5 million promissory note, at 5% interest, entitling Royalty to convert it into 1.75 million (post-split) Regency shares at $2 per share; and (ii) a $1,250,000 promissory note, payable at 9% interest. In effect, Royalty was given an option to receive 1.75 million Regency shares, exercisable by Royalty declaring its intent to convert and surrendering the $3.5 million note.

(2) In its separate dealings with Statesman, Regency, in turn:

(a) paid Statesman $1.02 million to redeem Statesman's 754,950 Regency

---

**13.** More specifically, the complaint alleges that Ponsoldt and Baldinger knew—but did not share with Carey and Craffey—that a monetization of Regency's interest in Security

Land was imminent, which would have rendered the Recapitalization unnecessary. 2004 Mem. Op., 2004 WL 3029868 at *3, n. 7.

shares (post-split), obtained when Statesman exercised its option to acquire 6.1 million (pre-split) Regency shares in 2001; and

(b) canceled the $2.44 million Statesman promissory note, which represented the consideration Statesman paid for its option to acquire 6.1 million (pre-split) Regency shares; and

(c) paid Statesman $2.73 million for Statesman's consent to amend the Certificate of Designation preferences of the Regency Series C Preferred (100% held by Statesman), with the result that any preferences would be paid not in cash but with NRDC stock; and

(d) paid Statesman $250,000 in exchange for an option to acquire Statesman's interest in a Regency subsidiary. Regency also transferred certain office furniture and equipment to Statesman.

(3) On October 28, 2002, as part of the Recapitalization, all members of Regency's board of directors (including Ponsoldt) resigned and were replaced by Royalty designees, namely, Levy, Neil Hasson, Stanley Fleishman and Errol Glasser. On November 8, 2002, Royalty partially exercised the $3.5 million convertible note and thereby obtained 750,-000 shares of Regency common stock, representing about 38.45% of Regency's outstanding shares. On July 3, 2003, Royalty converted the balance of the convertible note, thereby increasing its holdings to approximately 59.31 % of Regency's outstanding common stock.

**14.** Levy also benefited from Statesman's agreement to amend the preferences of the Series C Preferred because no dividend or liquidation preference payments by Regency (now controlled by Levy) would have to be made in cash.

**15.** Broken down as follows: $1.02 million to redeem Statesman's 754,950 Regency shares, $2.73 million for Statesman's "agreement" to

### 2. Effects of the Transaction

Although the terms of the Recapitalization were intricate, the transaction's ultimate effects are easily described.

*First,* Levy (through Royalty) provided $4.75 million cash to Regency to finance the transaction, in return for which Levy/Royalty ended up with the $1.25 million Regency note, plus 59.31% majority stock control of Regency (after converting the $3.5 million Regency note), and control of Regency's board.[14]

*Second,* Ponsoldt (through Statesman) received $4 million of the $4.75 million cash provided by Levy/Royalty.[15] In addition, Ponsoldt/Statesman's preexisting obligation to pay Royalty $2.44 million (the exercise price for Statesman's option to acquire 6.1 million pre-split Regency shares) was canceled. Thus, it appears from the complaint that Statesman ended up holding 6.1 million Regency shares (pre-split) for no consideration, which shares Statesman then sold back to Regency (post-split) for $1.02 million.

*Third,* Regency, now controlled by Levy (Royalty) ended up with $500,000 of the $4.75 million provided by Levy, after paying $250,000 in Recapitalization expenses.

*Fourth,* Regency's public shareholders received no financial or other economic benefit from the Recapitalization. Moreover, their combined stock ownership was diminished from a majority interest of approximately 62% to a combined minority interest of about 40%.[16]

amend the Series C Preferred designations; and $250,000 for the option to acquire Statesman's interest in a Regency subsidiary.

**16.** 2004 Mem. Op., 2004 WL 3029868 at *4. More precisely, Royalty (Levy) now holds 59.31% of Regency's outstanding common shares, and the public shareholders hold 40.69%. *Id.*

## D. *Unwinding of The Aggregate Sale*

In February 2005, Regency publicly disclosed that since December 2003, its 75% subsidiary, Iron Mountain Resources, had been in default on the December 2001 note representing the consideration for which Iron Mountain acquired the Aggregate from NRDC in the Aggregate Sale. In lieu of foreclosure, Iron Mountain reconveyed title to the Aggregate to NRDC, and NRDC then deemed the note satisfied. Although the Aggregate Sale was unwound to that extent, the harm alleged to have resulted from that transaction was not entirely undone: the amounts Regency paid in the Recapitalization for Statesman's consent to amend the Series C preferences—preferences that were allegedly inflated by reason of the Aggregate Sale [17]— were not repaid to Regency in the 2005. "unwinding" transaction.

After the unwinding transaction, the defendants moved to dismiss the Aggregate Sale claim as moot. As earlier noted, in October 2005, the Court of Chancery granted that motion without prejudice to the filing of an amended complaint. In May 2006, after an amended complaint was filed, the Court of Chancery held that the remaining Aggregate Sale claim was derivative, and dismissed the claim for failure to comply with Rule 23.1.

## II. *THE CLAIMS OF ERROR AND THE STANDARD OF REVIEW*

On this appeal, the Appellants challenge the dismissal of only two of their original claims: those arising out of the Recapitalization and the Aggregate Sale. Both claims were found to be exclusively derivative, and, therefore, dismissible for failure to comply with the demand requirement of Court of Chancery Rule 23.1. The Appellants claim that the Court of Chancery reversibly erred by holding that the claims were exclusively derivative, on two alternative grounds.

First, Appellants argue, the Recapitalization Claim could be brought directly because the Recapitalization shifted majority control of Regency from the public shareholders to Royalty, an entity wholly owned by Levy. As a consequence, the Regency directors became subject to—and violated—the duty, imposed by *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.* (*"Revlon"*),[18] to obtain the highest value available when carrying out the Recapitalization transaction. Because *Revlon* claims may be asserted directly by public shareholders, Appellants contend, the Recapitalization claim is direct. Moreover, because the only surviving portion of the Aggregate Sale claim (the $2.73 million paid to Statesman) was part of the Recapitalization, that claim is necessarily direct as well.

Second, and alternatively, Appellants argue that the Recapitalization transaction (including the Aggregate Sale) could be brought as a direct claim because the Recapitalization, which resulted from the exercise by Ponsoldt of his *de facto* control, constituted (i) an expropriation of economic value and voting power from the shares held by Regency's public shareholders, and (ii) a redistribution of the expropriated economic value and voting power to Royalty/Levy, who became Regency's absolute majority stockholder. That transaction, Appellants claim, correspondingly diminished the value and voting power of the

---

**17.** The value of the Series C preferences was tied to the value of the Aggregate. In the Aggregate Sale, the Aggregate—originally valued at $15 million—was valued at $18.1 million. It is alleged that the sole purpose of the Aggregate Sale was to artificially increase the value of the Aggregate (which had minimal value to begin with) to benefit Statesman as the sole holder of the Series C Preferred.

**18.** 506 A.2d 173 (Del.1985).

stock held by Regency's public shareholders, who ended up as minority stockholders. Therefore, Appellants contend, the Recapitalization claim is governed by *In re Tri–Star Pictures, Inc.*[19] and its recent progeny, *Gentile v. Rossette.*[20] Those cases hold that where a significant or controlling stockholder causes the corporation to engage in a transaction wherein shares having more value than what the corporation received in exchange are issued to the controller, thereby increasing the controller's percentage of stock ownership at the public shareholders' expense, a separate and distinct harm results to the public shareholders, apart from any harm caused to the corporation, and from which the public shareholders may seek relief in a direct action.

In response, all of the Appellees argue that the Appellants' claims of error have no merit, and that this Court should uphold the Court of Chancery's determination that the Recapitalization and the Aggregate Sale claims were exclusively derivative. This case is not governed by *Revlon,* Appellees urge, because (i) no sale or break up of the company took place, (ii) Regency's public shareholders were never eliminated from the enterprise and remain as stockholders of Regency; and (iii) the public shareholders were never deprived of a control premium, because Regency always had a controlling stockholder, and the Recapitalization changed only that controlling stockholder's identity.

Appellees further contend that this case is not controlled by *Tri–Star* or *Rossette.* For *Tri–Star* to be applicable, Appellees say, the transaction must have increased the voting power and economic value of the shares held by the significant stockholder (here, Statesman/Ponsoldt) at the expense of the public shareholders. In this case,

the beneficiary of the claimed expropriation was a third party—Royalty/Levy—not Statesman/Ponsoldt. *Rossette* is also inapplicable, Appellees urge, because even if the Recapitalization reduced the value and voting power of the outstanding shares owned by Regency's public shareholders, there was no corresponding increase in the value or voting power of the shares held by the corporation's controlling stockholder, *i.e.,* Statesman/Ponsoldt.

In short, Appellees contend that because the complaint does not allege facts establishing that the Recapitalization claim is direct, that claim is exclusively derivative. It further follows that the non-mooted portion of the Aggregate Sale claim, which was a component of the Recapitalization, is also derivative.

Besides the above arguments, Statesman and the Levy defendants urge separate, alternative reasons why the dismissal of the complaint should be affirmed. Statesman argues that even if this Court concludes that the claims at issue are direct, the complaint fails to allege a cognizable claim that Statesman was Regency's controlling stockholder that owed fiduciary duties to Regency and its public shareholders, or that Ponsoldt otherwise controlled Statesman. The Levy defendants separately argue that even if this Court were to conclude that the fiduciary duty claims at issue are direct, the dismissal of the complaint as to them must be affirmed, on the alternative ground that the complaint does not plead a cognizable claim that those defendants aided and abetted any fiduciary violation by Statesman and the Ponsoldt defendants.

■ Because the claims presented on this appeal require us to review the Court of Chancery's application of Rule 23.1, our review is *de novo* and plenary.[21] At the motion to dismiss stage, "[p]laintiffs are

---

19. 634 A.2d 319 (Del.1993) (*"Tri–Star"*).

20. 906 A.2d 91 (Del.2006) (*"Rossette"*).

21. *Brehm v. Eisner,* 746 A.2d 244, 253 (Del. 2000).

entitled to all reasonable factual inferences that logically flow from the particularized facts alleged."[22] In determining the sufficiency of a pleading under Rule 23.1, this Court, like the Court of Chancery, considers the pleading and applies statutes, case law and Rule 23.1 requirements to that pleading. To that extent, this Court's scope of review is analogous to the review of a ruling under Rule 12(b)(6).[23]

To clear away the underbrush and provide clarity of focus, we first address, in Part III A, *infra*, the separate defenses advanced by Statesman and the Levy defendants as alternative grounds for affirmance. We conclude that those alternative arguments lack merit and that as a consequence, this appeal presents only one pivotal legal issue: whether the Recapitalization claim (including its Aggregate Sale claim component) may be brought as a direct claim. We address that issue in Part III B, *infra*.

## III. ANALYSIS

### A. The Alternative Arguments Advanced By Statesman And The Ponsoldt Defendants

■ Statesman's alternative ground for affirmance is that the complaint fails to state a cognizable claim for breach of fiduciary duty by Statesman, because no facts are pled from which one can reasonably infer that Statesman controlled Regency or that Ponsoldt controlled Statesman. That argument lacks merit. In support of its argument that the complaint states no claim under *Revlon*, Statesman concedes that it had *de facto* control of Regency. Statesman's status as *de facto* controller,

combined with the allegation that Ponsoldt caused Statesman to exercise that control to effect the Recapitalization, establishes, for purposes of a motion to dismiss, that Statesman owed fiduciary duties to Regency and its public shareholders.

Moreover, the complaint adequately alleges that Ponsoldt controlled Statesman. Although Ponsoldt is not alleged to be Statesman's trustee, the complaint does allege that Ponsoldt negotiated and acted on behalf of Statesman from the time Statesman first obtained its interest in Regency through the time of the Recapitalization. No pled facts show that Levy ever spoke to or dealt with the unnamed bank trustee that Statesman claims controls Statesman, or that the trustee was involved in any transaction involving Statesman. Thus, the Appellants have alleged facts that, if true, would be sufficient to establish that Statesman was controlled by Ponsoldt, and that Ponsoldt and Statesman acted in concert to control Regency in both the Aggregate Sale and the Recapitalization transactions.[24]

■ Equally without merit is the Levy defendants' alternative argument that the dismissal of the complaint as to them must be affirmed, because it fails to state a claim that Levy and Royalty aided and abetted a breach of fiduciary duty by the Ponsoldt defendants. To state a claim for aiding and abetting a breach of fiduciary duty, a plaintiff must allege (1) a fiduciary relationship; (2) a breach of that relationship; (3) that the alleged aider and abettor knowingly participated in the fiduciary's breach of duty; and (4) damages proximately caused by the breach.[25] In this

---

**22.** *White v. Panic,* 783 A.2d 543, 549 (Del. 2001).

**23.** *Brehm v. Eisner,* 746 A.2d at 254.

**24.** That is, the complaint sufficiently alleges "domination by a minority stockholder through actual exercise of direction over cor-

porate conduct." *Gilbert v. El Paso Co.,* 490 A.2d 1050, 1055 (Del.Ch.1984) (citing *Kaplan v. Centex Corp.,* 284 A.2d 119 (Del.Ch.1971)).

**25.** *Malpiede v. Townson,* 780 A.2d 1075, 1096 (Del.2001); *Gilbert v. El Paso Co., supra,* 490 A.2d at 1057; *In re Telecommunications Inc.*

case, the Levy defendants contest the third element; that is, they contend that the complaint fails adequately to plead that the Levy defendants knowingly participated in the remaining defendants' breaches of duty.

■ "Knowing participation in a . . . fiduciary breach requires that the third party act with the knowledge that the conduct advocated or assisted constitutes such a breach." [26] In some circumstances, "the terms of the negotiated transaction themselves [may be] so suspect as to permit, if proven, an inference of knowledge of an intended breach of trust." [27]

■ Here, the Levy defendants contend that the complaint alleges no facts from which it can be inferred that the terms of the Recapitalization were "inherently wrongful" or that they had actual knowledge that the Ponsoldt defendants and Statesman were engaging in wrongful conduct. The Levy defendants argue that in the Recapitalization, Statesman sold its stock to Regency at "approximately market price" and that the conversion price of the $3.5 million convertible note was "higher than market price." [28] This argument also lacks merit.

The complaint avers that in the Recapitalization, Regency paid total consideration of $4 million, or $5.30 per share, for Statesman's 754,950 shares, while Royalty's conversion price was only $2 per share. The total consideration paid for Statesman's stock is alleged to have been far in excess of its "market value." Royalty, as the entity that provided $4.75 million in financing to Regency ($4 million of which went directly to Statesman), must

have been aware of the terms of the Recapitalization. It is also reasonably inferable that Royalty knew that that transaction's effect (if not its intent) was to dilute the stock interest of Regency's public shareholders to provide the means for Ponsoldt and Statesman to cash out their stock interest, and for Levy to obtain absolute majority control. Moreover, and tellingly, the complaint alleges that Levy and Ponsoldt wanted to keep their plan secret. In an October 2001 e-mail to Levy, Ponsoldt said, "We cannot sign any agreement that would be disclosable under securities laws. . . . We need an agreement signed and closed on the same day or something legal that does not have to be disclosed." The structure that Levy and Ponsoldt devised to allow them to "move forward," was a recapitalization that, unlike a merger or sale of all or substantially all of Regency's assets, would not require a shareholder vote or prior public disclosure. An additional pled fact showing Levy's active complicity was his suggestion that Ponsoldt tell his board of directors that the proposed Recapitalization could relieve them of potential liability in this litigation.

In summary, the complaint pleads facts from which it can be inferred that at all relevant times Ponsoldt and Statesman controlled Regency, and that the Levy defendants aided and abetted a breach or breaches of duty by the Ponsoldt defendants and Statesman in conceiving and carrying out the Recapitalization. Thus, if the claim(s) arising out of that transaction could have been brought directly against the Regency defendants, then those claims could have been brought directly against Statesman and the Levy defendants as well. Whether the Recapitalization claim [29] could be brought directly thus be-

---

S'holders Litig., 2003 WL 21543427 (Del.Ch. July 7, 2003).

**26.** *Malpiede v. Townson, supra,* 780 A.2d at 1097.

**27.** *Id.* at n. 79 (quoting *Greenfield v. Tele-Communications,* 1989 WL 48738, (Del.Ch. May 10, 1989)).

**28.** Royalty Ans. Br. at 29.

**29.** Although the parties treat the Recapitaliza-

comes the pivotal issue, to which we next turn.

### B. *May The Recapitalization Claim Be Brought As A Direct Claim?*

■ As earlier noted, the Appellants argue that their Recapitalization claim could be brought as a direct claim for two independent reasons. First (Appellants contend), that claim alleges a claim for breach of fiduciary duty under *Revlon*, which by definition is a direct claim. Specifically, the Recapitalization is alleged to have involved a transfer of majority control from Regency's public shareholders to Royalty/Levy without the payment of a control premium to the public shareholders. Second, Appellants contend, the complaint alleges a direct claim for breach of fiduciary duty under *Tri–Star* and *Rossette*, because the Recapitalization constituted an expropriation of voting power and economic value from Regency's public stockholders, and a transfer of that voting power and economic value to Levy/Royalty, to the corresponding detriment of Regency's public shareholders—all accomplished by Regency's *de facto* controlling stockholder, Statesman/Ponsoldt. Because we conclude that the Recapitalization claim may be brought as a direct claim under *Tri–Star* and *Rossette*, we do not reach or decide the Appellants' *Revlon*-based argument.

#### 1. *The Tri–Star/Rossette Doctrine*

Because *Tri–Star* and *Rossette* are the foundation of our analysis, we begin by discussing those cases and the doctrine they articulate.

In *Tri–Star*, the plaintiffs, who (like the Appellants here) were a class of minority stockholders of a Delaware corporation (Tri–Star Pictures), challenged an assets-for-stock transaction between Tri–Star and its largest stockholder, the Coca–Cola Company. Before the transaction, Coca–Cola (voting in concert with other significant stockholders aligned with it), held 56.6% of Tri–Star's common stock; the minority stockholder class held 43.4%. The plaintiffs alleged that Coca–Cola had wrongfully caused Tri–Star to issue an excessive number of Tri–Star shares to Coca–Cola in exchange for Coca–Cola shares having less value. As a result, Coca–Cola increased its stock interest in Tri–Star to about 80%, which in turn reduced the public shareholders' interest to approximately 20%. Reversing the dismissal of the complaint, this Court held that because Coca–Cola, as Tri–Star's largest stockholder, did not suffer a dilution of cash value, or of voting power, or of ownership percentage to the same extent and in the same proportion as the minority stockholders, the plaintiffs had suffered an injury that was unique to them individually, and that could be remedied by bringing a direct claim against the controlling stockholder and any other fiduciary responsible for the harm.

*Rossette* was an action by former minority stockholders of a Delaware corporation ("SinglePoint") against the company's former directors and its CEO/controlling stockholder. The claim arose from a self-dealing transaction in which the CEO/controlling stockholder forgave the corpora-

---

tion and Aggregate Sale claims separately in their briefs, it is undisputed that the only aspect of the Aggregate Sale transaction that was not reversed by the 2005 "unwinding" transaction was the $2.3 million "fee" Regency paid to Statesman to obtain Statesman's "consent" to amend the Series C Preferred preferences. Because the $2.3 million pay-

ment constituted the only harm allegedly resulting from the Aggregate Sale that was not unwound in 2005, and because that payment was a component of the Recapitalization, all further references to the "Recapitalization claim" in this Opinion should be understood as encompassing that remaining portion of the "Aggregate Sale claim" as well.

tion's debt to him, in exchange for being issued stock whose value allegedly exceeded the value of the forgiven debt. It was claimed that the transaction wrongfully reduced the cash value and the voting power of the public stockholders' minority interest, and increased correspondingly the value and voting power of the controller's majority interest. After the debt conversion, SinglePoint was later acquired in a merger, shortly after which the acquirer filed for bankruptcy and was liquidated. The shareholder plaintiffs then brought an action in the Court of Chancery to recover the value they claimed to have been wrongfully deprived of in the debt conversion. This Court held that that claim alleged the same kind of expropriation of economic value and voting power that was functionally indistinguishable from that alleged in *Tri–Star*. Therefore, the claim could have been brought either as a direct or as a derivative claim.

Because the issue presented here is whether the Recapitalization should be governed by the rule announced in *Tri–Star* and *Rossette*, we restate the reasoning, as set forth in *Rossette*, upon which that doctrine rests:

> There is, however, at least one transactional paradigm—a species of corporate overpayment claim—that Delaware case law recognizes as being both derivative and direct in character. A breach of fiduciary duty claim having this dual character arises where: (1) a stockholder having majority or effective control causes the corporation to issue "excessive" shares of its stock in exchange for assets of the controlling stockholder that have a lesser value; and (2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority)

shareholders. Because the means used to achieve that result is an overpayment (or "over-issuance") of shares to the controlling stockholder, the corporation is harmed and has a claim to compel the restoration of the value of the overpayment. That claim, by definition, is derivative.

> But, the public (or minority) stockholders also have a separate, and direct, claim arising out of that same transaction. Because the shares representing the "overpayment" embody both economic value and voting power, the end result of this type of transaction is an improper transfer—or expropriation—of economic value and voting power from the public shareholders to the majority or controlling stockholder. For that reason, the harm resulting from the overpayment is not confined to an equal dilution of the economic value and voting power of each of the corporation's outstanding shares. A separate harm also results: an extraction from the public shareholders, and a redistribution to the controlling stockholder, of a portion of the economic value and voting power embodied in the minority interest. As a consequence, the public shareholders are harmed, uniquely and individually, to the same extent that the controlling shareholder is (correspondingly) benefited. In such circumstances, the public shareholders are entitled to recover the value represented by that overpayment ... directly and without regard to any claim the corporation may have.[30]

There is one significant factual difference between this case and the facts alleged in *Tri–Star* and *Rossette:* Here, to the extent that the Recapitalization resulted in a dilution or expropriation of value and voting power of the shares held by the Regency public stockholders, that expro-

---

**30.** *Gentile v. Rossette, supra,* 906 A.2d at 100      (footnotes omitted).

priation did not redound directly (and correspondingly) to the benefit of Regency's controlling stockholder, Statesman/Ponsoldt. Rather, the direct beneficiary of any alleged expropriation of that voting power and economic value was a third party, Royalty/Levy, which owned no Regency stock before the Recapitalization. That factual difference, Appellees argue, is controlling, because it removes this case from the purview of *Tri–Star* and *Rossette.* The question before us is whether that factual difference, in the context alleged here, renders *Tri–Star* and *Rossette* inapplicable. We conclude that it does not and that *Tri–Star* and *Rossette* are controlling, for the reasons that follow.

### 2. *Tri–Star/Rossette* Control *The Recapitalization Claim*

The only basis for the Appellees' argument that the Recapitalization claim is not direct under *Tri–Star* and *Rossette,* is their attempted portrayal of the Recapitalization as a unitary transaction in which: (1) majority control is transferred in an arms' length exchange from the public shareholders to a non-fiduciary third party having no previous stock ownership in the corporation, and (2) the (former) controlling stockholder receives no corresponding benefit from any increased voting power or economic value expropriated from the public shareholders. This scenario, the Appellees contend, falls outside the transactional paradigm that triggers the application of *Tri–Star* and *Rossette.*

At first glance, that argument appears to have force. The argument disintegrates, however, once the Recapitalization is scrutinized more intensively and in terms of its (alleged) true substantive effect. Looking through the form of the transaction to its substance, it becomes apparent that the Recapitalization is properly analyzed as two separate transactions that Ponsoldt and Levy, by creative timing and coordination, caused simultaneously to

be rolled into one. The first of those transactions (transaction # 1) was a *Tri–Star/Rossette* expropriation of voting power and economic value from the public shareholders by and to the controlling shareholder; and the second (transaction # 2) was a transfer of the benefits of that expropriation by the controlling shareholder to the third party. Causing both transactions to occur simultaneously obscures the effects of the first transaction if the latter were considered in isolation.

To elaborate, transaction # 1 would simply substitute Ponsoldt for Regency, so that it is Ponsoldt who deals directly with Royalty/Levy. Thus: Royalty/Levy loans the same $4.75 million to Ponsoldt, rather than to Regency. In exchange, Ponsoldt delivers to Royalty/Levy his personal $4.75 million promissory note. Ponsoldt then transfers the $4.75 million to Regency (controlled by Ponsoldt). Regency then: (i) pays $4 million to Statesman (controlled by Ponsoldt) to redeem the 754,950 Regency shares held by Statesman, and (ii) pays Ponsoldt $4.75 million in the same two promissory notes, including the $3.5 million note convertible into 1.75 million Regency shares. Ponsoldt then immediately converts the $3.5 million note into 1.75 million Regency shares.

Thus, in transaction # 1, Ponsoldt, as the *de facto* controller of Regency and Statesman, ends up as the absolute majority stockholder of Regency, to the corresponding detriment of the Regency public shareholders. If in exchange (as the complaint here alleges) Regency received value that was less than the value of the 1.75 million shares newly issued to Ponsoldt, then this transaction clearly falls within the ambit of *Tri–Star/Rossette,* and any claim for redress by Regency's public stockholders could be brought directly.

In transaction # 2, Ponsoldt merely completes the circle by substituting Royal-

ty/Levy for himself as the new controller of Regency, as (it is alleged) actually occurred in the Recapitalization. That is, Ponsoldt transfers his newly-acquired controlling stock interest in Regency (equivalent in value to $3.5 million), plus the $1.25 million Regency note, to Royalty/Levy. In exchange, Royalty/Levy cancels the Ponsoldt $4.75 million promissory note, and then proceeds to take control of Regency's board of directors. That is, in transaction # 2 the initial $4.75 million financing that Ponsoldt, rather than Regency, received, would simply be unwound. That done, the result is substantively identical to what in fact occurred in the Recapitalization.

If transactions # 1 and # 2 were structured and timed to occur simultaneously at a single closing, then the combined transactions would be identical to the Recapitalization in all respects—both in substance and in form. Analyzed that way, the Recapitalization would be governed by *Tri–Star/Rossette*, because Regency's *de facto* controlling stockholder (Ponsoldt/Statesman) would have: (1) caused Regency to engage in a transaction that, by means of a stock issuance, resulted in the controller expropriating for himself, economic value and voting power from, and to the corresponding detriment of, the public shareholders; and then (2) transferred that majority stock interest to a third party—Levy/Royalty—after having monetized

that controlling interest by receiving (through Statesman) all but $750,000 of the $4.75 million cash proceeds of the Recapitalization.

The question, as we view it, is whether because these two component transactions were timed to occur simultaneously rather than sequentially, Regency's public shareholders should lose their entitlement, under *Tri–Star/Rossette*, to seek redress in a direct action. We think not. To do so would unjustly exalt form over substance in circumstances where the identical policy concerns that underlie *Tri–Star* and *Rossette* exist here.[31]

▬▬▬▬ It is the very nature of equity to look beyond form to the substance of an arrangement.[32] "Equity will not permit one to evade the law by dressing what is prohibited in substance in the form of that which is permissible."[33] So too, equity will not permit a fiduciary to deprive his beneficiaries of their entitlement to seek direct redress for fiduciary misconduct by structuring a transaction so as to obscure that entitlement. Although this case differs from *Rossette* in transactional form, the underlying concerns and substantive effects that justify recognizing an entitlement to sue directly are the same.

In this case, as in *Tri–Star* and *Rossette*, the fiduciary exercises its stock control to expropriate, for its benefit, economic value

---

**31.** A proposition that courts, particularly courts of equity, are loathe to endorse. In the area of tax law, courts have enunciated various doctrines such as step transaction, business purpose, and substance over form, all of which allow the substantive realities of a transaction to determine the tax consequences. *Falconwood Corp. v. United States,* 422 F.3d 1339, 1349 (Fed.Cir.2005). See also, *Brown v. United States,* 329 F.3d 664, 671 (9th Cir.2003) (applying the "step transaction doctrine," which "collapses formally distinct steps in an integrated transaction in order to assess federal tax liability on the basis of a realistic view of the entire transac-

tion...."); *Comm'r v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 89 L.Ed. 981 (1945) (holding that it is impermissible to "allow the true nature of a transaction to be disguised by mere formalisms, which exist solely to alter tax liabilities ... because that would seriously impair the effective administration of the tax policies of Congress.").

**32.** See *Monroe Park v. Metropolitan Life Ins. Co.,* 457 A.2d 734, 737 (Del.1983) ("Equity regards substance rather than form.").

**33.** *Kelley v. Mayor and Council of City of Dover,* 300 A.2d 31, 38 (Del.Ch.1972).

and voting power from the public shareholders. In the classic *Tri–Star/Rossette* paradigm, the ultimate transferee and beneficiary of the expropriation is the fiduciary. Here, the ultimate transferee is a third party, with the controlling stockholder being an intermediary that transfers the benefits of its expropriation to the ultimate beneficiary in exchange for cash or other equivalent value.

That is how equity views the Recapitalization, despite the fact that as a matter of form, the Recapitalization consisted of two transactions that occurred simultaneously, with the result that to an outside observer, the controlling stockholder never held the benefits of the expropriation for any length of time that the naked human eye could discern. In our view, that difference in form, which is a product of transactional creativity, should not affect how the law views the substance of what truly occurred, or how the public shareholders' claim for redress should be characterized.[34] In both cases the fiduciary exercises its control over the corporate machinery to cause an expropriation of economic value and voting power from the public shareholders. That the fiduciary does not retain the direct benefit from the expropriation but chooses instead to convert that benefit to cash by selling it to a third party,[35] is not a circumstance that can justify depriving the injured public shareholders of the right they would otherwise have to seek redress in a direct action.

Accordingly, we conclude that although the Court of Chancery correctly determined that the Recapitalization claim could be brought derivatively, it erred in concluding that that claim was exclusively derivative.

## IV. CONCLUSION

For the foregoing reasons, the judgment of the Court of Chancery is reversed, and the case is remanded to that Court for further proceedings consistent with this Opinion.

**34.** See *Griffiths v. Helvering,* 308 U.S. 355, 358, 60 S.Ct. 277, 84 L.Ed. 319 (1939) (holding that liability cannot be escaped by anticipatory arrangements and contracts however skillfully devised); *Minn. Tea Co. v. Helvering,* 302 U.S. 609, 613, 58 S.Ct. 393, 82 L.Ed. 474 (1938) ("A given result at the end of a straight path is not made a different result because reached by following a devious path.").

**35.** As earlier noted, Ponsoldt/Statesman received the benefit of the expropriation indirectly, by causing Statesman's stock interest to be redeemed by Regency, and then for Regency to issue a controlling stock interest (in the form of a convertible note) to Levy/Royalty. Ponsoldt/Statesman, in return, received all but $750,000 of the $4.75 million that Levy/Royalty paid to finance the transaction.